Kidd *v.* Laird.

KIDD *et al. v.* LAIRD *et al.*

A STATEMENT on motion for new trial signed by the Judge, and appearing, from the minutes of the Court, to have been used on the hearing of the motion, is sufficiently authenticated.    The statute points out no mode of authentication, and any satisfactory evidence in the record, in some legitimate and proper form, that the statement has been examined and approved by the Judge, is sufficient.

Running water, so long as it continues to flow in its natural course, cannot be made

Kidd *v.* Laird.

the subject of private ownership. A right may be acquired to its use, which will be regarded and protected as property, but this right carries with it no specific property in the water itself.

The owner of a ditch has the exclusive and absolute power of control, and right of enjoyment, of the water diverted by and flowing in his ditch, but whether such water be his private property, it is not necessary to decide.

A person entitled to divert a given quantity of the water of a stream, may take the same at any point on the stream, and may change the point of diversion at pleasure, if the rights of others be not injuriously affected by the change.

This right so to change the point of diversion does not depend upon how the right to the use of the water was acquired, whether by express grant or by prescription; or whether it rests in the parol license, or the presumed consent of the proprietor. The difference as to the source of the right relates to the mode of determining its existence and extent, and not to the manner of its exercise and enjoyment.

In this case, the rights of both parties, as fixed by the priority and extent of their respective appropriations, though not founded on the legal title, are as perfect and absolute as if acquired by prescription, or express grant from the riparian owner.

Where there are several separate defenses, each of which is sufficient to defeat the action, and these defenses are submitted to the jury, with evidence in support of each, and the verdict is general for the defendants, it cannot be set aside, if it be right as to any one issue, though wrong as to all the others.

A verdict found on any fact or title distinctly put in issue, is conclusive in another action between the same parties or their privies in respect of the same fact or title.

But the fact or title must be material and relevant; must be distinctly in issue; must be tried by the jury, and constitute the basis of their verdict; and, unless specially found, must have been necessarily passed upon by the jury.

Where a verdict is general, its effect will be limited to such issues as necessarily controlled the action of the jury.

APPEAL from the Fourteenth District.

The case is probably sufficiently stated in the opinion of the Court. But as the testimony is voluminous and conflicting, and as the verdict was general " for defendants," and as it is important that these mining cases should be as fully reported as possible, it is deemed best to insert the facts claimed to be the result of the testimony by each party.

Facts as claimed by Appellants.

By the evidence contained in the record, we think the folowing facts are conclusively established, viz:—1st. The Deer creek and Coyote ditches have the advantage of priority over all others. This is admitted by the answer. 2nd. The Deer Creek Mining Company's ditch

was constructed before the defendants' Gold Flat ditch.  3d.  The Deer Creek Mining Company's ditch was constructed before Laird's new ditch.  4th.  The Gold Flat ditch, with its original form and size, was constructed before the Snow Mountain ditch.  5th.  The Snow Mountain ditch has priority over Laird's new ditch, and over the enlargements of the Gold Flat ditch.  6th.  The enlargements of the Coyote and Deer Creek Mining Company's ditches were all made before the construction of Laird's new ditch, and before the enlargements of the Gold Flat ditch.  The Deer creek ditch was never enlarged.

And here it may be as well to give the dates of the construction of the several ditches mentioned.  The Deer creek and Coyote ditches were both constructed in the fall of A. D. 1850.  The Deer Creek Mining Company's ditch, in the spring of A. D. 1851.  The Gold Flat ditch was commenced about the last of 1851, or first part of 1852, and completed with its original dimensions about June, A. D. 1852. The Snow Mountain ditch was located and its construction commenced on the seventh day of April, A. D. 1853; and was completed so as to convey water, during that year.  It was finally and fully completed some time in the spring of 1854.  The Laird's new ditch was located in June or July, A. D. 1855, and completed so as to divert water, by the thirty-first of December, of the same year.  Upon this last proposition alone, we presume, will there be any dispute.

Lastly, the enlargements of the Deer Creek Mining Company's ditch were made in the year 1852, and at the lower end some enlargements were made in the years 1853 and 1854.  Those of the Coyote ditch were in 1854.  The Deer creek ditch was never enlarged.  The enlargements of defendants' Gold Flat ditch were made in the year 1856.

Facts as claimed by Respondents.

1.  Kidd and others were the owners of two ditches called the Deer creek ditch and the Coyote ditch, constructed in 1850, to take each one hundred inches (miner's measure) of water from the stream known as Deer creek, in Nevada county, to the mines adjacent, for mining purposes.

2.  In the year 1851, Laird and Chambers constructed a ditch, called the Gold Flat ditch, lower down on the same stream, of sufficient size to divert and convey away about five hundred inches of water (miner's measure) to the adjacent mines for mining purposes.

3. Later in the year 1851, the Deer Creek Mining Company's ditch, belonging to Kidd and others, was constructed of capacity to convey about one hundred inches of water (miner's measure) from the same stream.

4. Later in the year 1851, the Coyote ditch above named was enlarged from about one hundred inches to about three hundred inches capacity.

5. Still later in point of time, the Deer Creek Mining Company's ditch, belonging to Kidd and others, was enlarged from its original capacity of about one hundred inches, to about four hundred inches— this ditch being above or higher up the stream than those above named.

6. In the year 1853, the ditch called the Little Snow Mountain ditch was constructed from the main north tributary of Deer creek, belonging to Kidd & Co., above all the ditches, of capacity about one hundred inches.

7. In the year 1853, Shannon & Co. constructed a ditch from the same stream at a point between the Coyote ditch and the Deer Creek Mining Company's ditch, of capacity about four hundred inches or five hundred inches, and after passing into the hands of Choquette & Co., was sold by them to Laird & Chambers, who in 1854 extended the same on to the mines in the vicinity of Nevada city; this being called Laird's new ditch.

8. In 1854, Kidd and others constructed the Big Snow Mountain ditch, at the forks of the two main tributaries of Deer creek, one mile or more below the Little Snow Mountain ditch, and two miles above the Deer Creek Mining Company's ditch, of capacity about eight hundred inches.   The two Snow Mountain ditches, after running the distance of ten miles apart, connect near a reservoir at their lower terminus.

9. In consequence of the partial exhaustion of the mines at the terminus of the Deer creek ditch, the lowest of the ditches of Kidd and others, and in consequence of the enlargement of the Coyote ditch from one hundred to three hundred inches, the two running parallel, and within a few feet of each other, Kidd and others discontinued the use of the Deer creek ditch in 1854.

10. During the time mentioned in the complaint, Kidd and others diverted, by means of their Big Snow Mountain ditch and their Deer Creek Mining Company's ditch, as enlarged, 1,200 inches of water, when-

ever the supply in the stream was equal—these ditches being higher up than either one of Laird and others—and thus deprived Laird and others, for the same period, of their quantum, whenever the supply in the stream fell below 1,200 inches.

11. For much of the period complained of, Kidd and others "run waste" large quantities of water; or in other words, to prevent Laird & Chambers from getting any portion, diverted it at points above on the stream, and run it through their ditches, and without using or selling it, or permitting any one to use it, turned it back into the natural channel below, and around the mines and works of Laird & Chambers.

12. While Kidd and others were running their Little Snow Mountain ditch and Big Snow Mountain ditch and Deer Creek Mining Company's ditch full, the quantity in these three ditches, the three highest on the creek, being about 1,300 inches, or 1,000 inches more than they were entitled to, Laird & Chambers were running one hundred and fifty to three hundred and fifty inches through their ditch, called Laird's new ditch, a part of which time none or very little water was left in Deer creek, to flow below to the Coyote ditch of Kidd and others, and their Deer creek ditch, and none left to flow to Laird's Gold Flat ditch.

For the deprivation of water in the two ditches called Coyote and Deer creek ditches, caused as above appearing, Kidd and others brought this suit to recover $10,000 damages.

The names and situations of the various ditches in regard to which evidence was admitted, are: 1st. The Deer creek and Cayote ditches, which tap the creek within about one-half mile of each other.   2d. Laird's new ditch—the one complained of by the plaintiffs—which is above the Deer creek and Coyote ditches.   3d. Laird's Gold Flat ditch, which intersects with Deer creek some distance below the Coyote and Deer creek ditches, and at a point three and a half miles below the head of Laird's new ditch.   4th. The Deer Creek Mining Company's ditch, above the head of Laird's new ditch, and on the south side of Deer creek; all the other ditches, except the Gold Flat ditch, are on the north side.   5th. The Snow Mountain ditch, which taps the stream above all the others.

Starting from the mouth of Deer creek, and traveling up the stream, a person would arrive at the head of the various ditches in the order following: Laird's Gold Flat ditch, Deer creek ditch, Coyote ditch, Laird's new ditch, the Deer Creek Mining Company's ditch, the Snow Mountain ditch.   Of these six, four belong to the plaintiffs, viz: The

Deer creek, the Coyote, the Deer Creek Mining Company's, and the Snow Mountain; and two, the Gold Flat, and Laird's new ditch, to the defendants.

The contest in the case was upon the following points: 1st. As between the Deer creek and Coyote ditches, on the one hand, and Laird's new ditch on the other. 2d. Between the enlargements (if any were made) of the Deer creek and Coyote ditches, and Laird's new ditch. 3d. Between Laird's new ditch and the Deer Creek Mining Company's ditch, with its enlargements. 4th. Between Laird's new ditch and the Snow Mountain ditch.

The Court below admitted testimony in regard to the Gold Flat ditch, which added the following complications and points to the case, viz: 5th. As between the Deer creek and Coyote ditches, and their enlargements, and the Gold Flat ditch and its enlargements. 6th. Between the Deer Creek Mining Company's ditch and its enlargements, and the Gold Flat ditch and its enlargements. 7th. Between the Snow Mountain ditch and the Gold Flat ditch. 8th. Between the Snow Mountain ditch and the enlargements of the Gold Flat ditch. 9th. Between the enlargements of the Coyote and Deer Creek Mining Company's ditch, and the enlargement of the Gold Flat ditch.

The verdict was: "We the jury in the above entitled cause find for defendants."

The order overruling the motion for new trial states, that "the motion would be granted, if the effect of the verdict of the jury and judgment thereon will be to limit the quantity of water to which plaintiffs are entitled to the priority, to one hundred inches in each of their two ditches, to wit: the Coyote and Deer Creek ditches; for the testimony of defendants' witnesses, to say nothing of plaintiffs,' all showed that each of the ditches above named were of sufficient capacity to run much over one hundred inches of water, before defendants had constructed any ditches.  But I infer the jury must have concluded that plaintiffs themselves had diverted the water to which they were entitled for the Deer Creek and Coyote ditches, by means of their other ditches above, and that these facts could be shown, should it ever hereafter be necessary, to determine what was really in issue upon the former trial."

There was much evidence as to the size and capacity, and the enlargements of all the ditches.

Defendants had judgment.  Plaintiffs appeal.

*McConnell & Niles,* for Appellants.

I. The instruction given by the Court, that a person entitled to divert a given quantity of the water of a stream, may take the same at any point on the stream, and may change the point of diversion at pleasure, if the rights of others be not injuriously affected by the change, is not law. The defendants, by constructing the Gold Flat ditch, acquired a property in a quantity of water of Deer creek, equal to the capacity of their ditch, and having such a property in it, they have a right to take it by means of other ditches, at any point on the stream above or below.

Property in water is of two kinds, viz: property in water as a "power," that is, for its momentum, and property in the *corpus* of the water. Running water, while it continues to flow, can only be subject to the first mentioned sort of property.

The water power which a riparian proprietor has, is said to consist of " the difference of level between the surface, where the stream in its natural state first touches the land, and the surface where it leaves it." (3 Kent's Com. 439–440, note 6; Ang. on Water Courses, sec. 94; *Tyler* v. *Wilkinson,* 4 Mason's C. C. 400; 7 Barr. 383–384; *Commonwealth* v. *Church,* 1 Id. 105.) He don't own a single drop of water while it continues flowing. He may, however, appropriate a reasonable portion of it for his natural uses, and after he appropriates it, it is his, and not before.

Vattel classes running water among " those things which, in their own nature, cannot be possessed." (Vattel's Law of Nations, book 1, chap. 20.) In *Mason* v. *Hill,* (5 Barn. & Adol. 21–22, 27 Eng. C. Law, 19) Lord Denman lays it down as a rule common to the English and to the civil law, that "running water is common," and in *Liggine* v. *Inge,* (7 Bingh. 692, 20 Eng. Com. Law) Lord C. J. Tindal said: " Water flowing in a stream, it is well settled by the law of England, is *publici juris.* By the Roman law, running water, air, and light, were considered as some of those things which were *res communes,* and which were defined things, the property of which belonged to no person, but the use to all; and by the law of England, the person who first appropriates any part of the water flowing through his land, to his own use, has a right to the use of so much as he then appropriates, against any other."

The language of the civil law is : " *Et quidem naturali jure, communia sunt omnium hæc, aer, aqua profluens, et mare, et per hoc, littora maris.*" And Vinnius, the commentator on the institutes, explains the

term *communia* as follows:—" *Communia sunt quia natura omnium usum perdita, in nullius adhuc ditionem aut dominum pervenerunt;*" "things common are such as are devoted to the use of all, and have not, as yet, come under the control or dominion of any one." This same author makes a distinction between a river and its water, the former being a fixed and perpetual body, capable of being owned; the latter continually changing and passing away, and incapable of becoming property, except by being separated from the river, and segregated from the mass of water left flowing therein. (See also 3 Kent's Com. 440; 2 Binn. 475–495–14; Serg. & R. 71; 8 Watts, 434.) It has been decided that even the Legislature cannot alien flowing water. (1 Halst. 76.)

The momentum or power of flowing water can, however, be aliened. In the case of *The Mayor* v. *The Commissioners*, (7 Barr. 363) the Supreme Court of Pennsylvania held, per Gibson, C. J., that water was common in its origin, "and if (say they) it be common at first, it must continue to be so, while it is returning by its natural channels to the ocean. No one, therefore, can have an exclusive right to the aggregate drops of water that compose the mass thus flowing, without contravening one of the most peremptory laws of nature."

No man can acquire a property in any given quantity of water, by merely constructing a ditch to the stream containing it. He must actually appropriate or divert it. By the construction of his ditch, a person acquires a right to divert or appropriate, but nothing more.

As to the kind of property the ditch owner has in the water he actually diverts, though not necessarily involved here, we say; as soon as a man has actually segregated a portion of the water of a running stream from the mass naturally flowing therein, and has reduced it to possession, and under his control, by means of artificial structures, he has a property in it, in the widest and strongest sense in which a man can be said to have a property in one of the natural elements.

Artificial water works are becoming common throughout the world. When a company, or an individual, has erected aqueducts and tanks, and filled them with water, for the purpose of selling it, we see no greater reason why they should not be regarded as the owners of the mass of water thus collected, than that the man who has filled his bucket at the well, should be considered as having a property in its contents.

The use to which water diverted for mining purposes is put, is twofold. The water itself is used for dissolving the earthy matter, and

Kidd v. Laird.

extracting the gold therefrom, and its momentum is used to carry off the refuse matter. In fact, by means of recent inventions, water is subjected to use in divers modes, by·the mining population of the country, but it is not the use, that in those cases determines the nature of the property, but the fact that the ditch proprietor has, by the construction of artificial works, segregated the water flowing therein from the natural mass, and thereby obtained direct dominion over it.   (7 Barr. 363–364.)

If the right claimed by the defendants, and accorded them by the Court below, can't be sustained on the ground that they had a property in the flowing water of Deer creek, coëxtensive with the capacity of their Gold Flat ditch, upon what principle can it be sustained?   Their position is in conflict with the tendency of the entire body of decisions rendered by this Court, in relation to water rights.   (*Irwin* v. *Phillips*, 5 Cal. 140 ; *Maeris* v. *Bicknell*, 7 Id.; *Eddy et als.* v. *Simpson*, Id. 340 ; *Hill* v. *King*, 8 Id.; *Parke* v. *Kilham*, Id. 77.)

In all these cases, and particularly in the last one, this Court recognizes the principle, that in order to acquire a water right as against others, it is essential that not only the line of the proposed ditch should be fixed by a survey, stakes and notices, but that the head or point where it is proposed to tap the stream, should be definitely determined.

2. As to the latter part of the instruction, which limits the right to cases where no injury is done other persons, we say, in these cases no actual injury need be shown.   Whenever a right is infringed, the law gives nominal damages at least.   (*Ashly* v. *White*, Lord Rayn. 938 ; 1 Smith's Lead. Cases, 260–5–125, notes; *Seneca Road Co.* v. *Auburn R. R. Co.* 5 Hill, 171 ; *Pastorius* v. *Fisher*, 1 Rawle, 27; *Alexander* v. *Kerr*, 2 Id. 83 ; 7 Serg. & Watts, 11 ; 9 N. H. 88 ; *Sackider* v. *Beers*, 10 John. 241 ; 13 Conn. 269 ; Sergeant Williams' note to *Mellor* v. *Spateman*, 1 Saunders, 346, a.)

The case of the Tunbridge Well Dippers (2 Wilson, 414) is familiar to the Court.   In that case, the Court of Common Pleas held that " an action will lie for the possibility of an injury," and in *Wells* v. *Watting*, (2 Wm. Black. 1233) the Court said that " a probable damage is a sufficient injury on which to ground an action." In *Crooker* v. *Bragg*, (10 Wend. 264) the Court said, " we cannot take from one party a right, for the sake of the convenience of another." (See also 2 Greenl. Ev. 257–258 ; 1 Gallison C. C. 433 ; 3 Fairchild, 183 ; 17 Maine, 128 ; 2 East. 154 ; 4 B. & A. 410- 412 ; Adol. & E. 488 ; 3 Scott's W. R. 390 ; 1 Bing. N. C. 549 ; 1 Gil. Ill. 544 ; 24 Wend. 189 ; 5

12

Hill, 242; 1 Id. 484; 4 Denio, 554; 2 Story's C. C. 665; 16 Pick. 64; 5 Met. 517; 12 Id. 535; 1 Denio, 548; 2 Met. 490; 1 Bar. & Ald. 415; 10 M. & W. 109; 1 Taunton, 121; Sedgwick on Damages, chap. 2, 47–56.)

It is one of the great advantages which plaintiffs ought to possess by reason of their priority, and their position on the creek, that they can take the water belonging to the Deer creek and Coyote ditches from the stream before the Gold Flat ditch can. This privilege is a positive right. But this right is entirely lost, if the defendants are allowed to take their Gold Flat water above them. We do not urge that priority of water right necessarily involves the right to be the first to take water to fill a ditch, for that would forever prevent a person from going above the dam of the first ditch constructed to a stream, and diverting the water, but we mean to say, that under the actual circumstances of this case, the Deer creek and Coyote ditches did have, by virtue of their position and priority, the right to the advantage of taking their share of the water at a point higher up the stream than the Gold Flat ditch did. The question is between the ditches of plaintiffs and the Gold Flat ditch, not Laird's new ditch.

True, the defendants, instead of locating and constructing their Gold Flat ditch, so as to intersect with the creek at its present head, might originally, had they seen proper to have done so, have continued it up, so as to tap the stream above the dams of the plaintiffs. But they did not do so. On the contrary, by constructing their ditch and dams below ours, they voluntarily yielded to us, as between the Gold Flat ditch and ours, the right to fill our ditches, before the water of the creek reached theirs.

Again: the defendants own two ditches, the Gold Flat and Laird's new ditch. The Gold Flat has rights, next in point of priority to those of the Deer creek, the Coyote and Deer creek Mining Company's ditches; but Laird's new ditch comes after all of those. Now it is only in times of high water, that Laird's new ditch can be entitled to take water from Deer creek, because, it being last in point of time, all the other ditches on the creek (some dozen in number) have the preference over it. The Gold Flat ditch, however, (having been constructed as far back as 1852) can take water when it is moderately low in the creek; when water is plenty and abundant, the privilege of getting the first supply is of little consequence. Hence the exercise of defendants' right to take water into their new ditch, by virtue of the ownership of

such new ditch, can never be vexatious or injurious to plaintiffs, because it can only be had when water is abundant. But if they can, at a time of the year when, as owners of the new ditch, they are not entitled to water, still use such new ditch to divert the water to which they are entitled as owners of the Gold Flat ditch, all of the advantages that pertain to plaintiffs as against the new ditch, are lost, or rather transferred to the Gold Flat ditch, or more properly speaking, to the new ditch.

II.   The verdict of the jury is conclusive as to the capacity of plaintiffs' Deer creek and Coyote ditches, and limits their right of diversion through each of those ditches to one hundred inches of water, and this being confessedly contrary to the evidence, the verdict should have been set aside.

This question of capacity was in issue.   The verdict of a jury upon any fact or question distinctly put in issue and tried, is conclusive upon the fact or question, either as a bar or by way of estoppel.   The verdict is not only conclusive upon the identical cause of action, but also upon any fact or title put in issue and tried in the first instance as a bar—in the second, by way of estoppel. (*Outram* v. *Morewood,* 3 East, 346; *Vooght* v. *Winch,* 3 Barn. & Ald. 662; *Burt* v. *Sternburgh,* 4 Cow. 559–562; *Bird* v. *Randall,* 3 Burrows, 1354; 2 Wheaton's Ed. of Selwyn's N. P. 1356; *Gardiner* v. *Buckbee,* 3 Cow. 120; *Eastman* v. *Cooper,* 15 Pick. 276; *Smith* v. *Whiting,* 11 Mass. 445; *Kilhefer* v. *Herr,* 17 Serg. & R. 319–327; *The Duchess of Kingston's* case, 11 State Trials, 262; *Marsh* v. *Pier,* 4 Rawle, 73; *Bryant* v. *The Commonwealth Insurance Company,* 13 Pick. 550.)

Parol evidence is admissible in the absence of more authentic proof, to show what issues were tried; but in this case we have more authentic proof, viz: the record.   A fact may be in issue and actually tried, and yet the jury may not have passed upon it.   But in such cases, the law for many reasons presumes that they did pass upon it, and will not permit that presumption to be rebutted.

Where a number of issues are tried, the verdict and judgment must settle something; and where the record (or other proof) shows that a number of issues were submitted to the jury, and a general verdict is the result, how can the Court determine what particular point formed the principal subject for their deliberations, and the ground work of their verdict?   Moreover, when there are several defenses, each being sufficient, when proved, to defeat the action, every juror may place his verdict upon a different ground.

In the case at bar, the District Judge inferred, from his knowledge of the facts of the case, that the jury merely intended to find that plaintiffs had not been damaged by the diversion of water by the defendants. But the law will not permit the private opinion of the Judge, as to the intention of the jury, to control the legal effect of the verdict and judgment.

*Meredith & Hawley*, for Respondents.

I. The statement on motion for new trial is not so authenticated that it can be used. It is neither signed by the Judge, nor the attorneys, nor is there any evidence in the record that it was ever examined or approved by the Judge. The judgment must, therefore, be affirmed.

II. The common law rules, as to the possession and ownership of water, have no force here. In this State, possession or actual appropriation is the mode of acquiring, and priority of possession the test of right to water. It may be partially or wholly diverted from its natural channel and severed into any number of parts, between as many persons, for mining, milling or other useful purposes; it becomes property by appropriation, and a right may exist in it to a given quantity; it may be sold to miners and others by the inch or head, or by the pint or pound; there may be not only the right to divert, but a special right in the water itself. (*Irwin* v. *Phillips et als.* 5 Cal. 140; *Tartar* v. *Spring Creek Co.* Id. 395; *Kelly* v. *Natoma Water Co.* 6 Id.; *Hoffman* v. *Stone et als.* 7 Id.; *Stan* v. *Child*, 20 Wend.)

A water right in the mineral region is acquired and continued as an incident to the occupation of the public land, and to the right of mining upon the same, or pursuing some other lawful avocation. (*Tartar* v. *Spring Creek W. & M. Co.* 5 Cal. 399; *Merced Mining Co.* v. *Fremont*, 7 Id. 317; *Crandall* v. *Woods*, Id.)

When A has constructed a ditch and diverted water from its natural bed and caused it to flow over his mining claims at a great distance from the natural bed, the flow of such water over his claims is an incident of his claims, and he is entitled to equal protection in the enjoyment of that incident as of the claims themselves. So of the water vendor, who has dug his ditch and taken the waters of a stream a great distance from their natural channel to and across a parcel of the public land occupied by him as the place of marketing the water thus conducted. So of the mill owner, who has made a similar diversion of water to his mill premises, or of any other occupant of public land who,

Kidd v. Laird.

by acts of appropriation, has caused a stream to become an incident to the particular lot of land occupied by him. The question now arises, when is the enjoyment of that incident infringed upon—when is the water right appertaining to such occupancy disturbed?

This question can only be answered by determining the extent of his occupancy, or the limits on which one is to be regarded as the presumed grantee of the public land.

In the case of the miner, his occupancy or presumed proprietorship extends only to the limits of his mining claims, and in the soil along the route over which the water is conducted by him he has no proprietorship or interest. His water right is fully enjoyed and protected so long as the flow of the water is uninterrupted to and over the parcel of ground occupied by him for mining purposes, whether conveyed over the exact route selected by him or any other as short and good as the original.

So with the ditch owner or water vendor. His right is not a right to the flow along a given or specific route, between the banks of a particular ditch, but a right to have a given quantity at the place of use, or for marketing, as incident to his possessions there.

His right to any water whatever or anywhere can only be maintained upon the basis of his pursuit and his possession of a part of the public lands. He neither claims, nor has any ownership in the land excavated for the ditch, any more than in the natural bed of the stream above the ditch. The ditch constructed by him is but a continuation of the water course.

A stream in the mineral region, and the waters naturally flowing in the same, may be compared to a cistern, tank or lake containing a quantity of water subject to be appropriated, and those who dig ditches of given capacity from such stream to persons who tap the cistern, tank or lake by apertures of different dimensions. In each case there is an appropriation only of a given quantity of the water contained in a common receptacle, and the right to have such quantity is not dependent upon or incident to the ownership of the soil over which such quantity may pass to the place selected by its owner to enjoy or use it.

This suit is brought to recover damages for an alleged diversion of water from two ditches, the soil under or on either side of which is not owned by complainants, and who cannot claim the flow through such ditches as riparian proprietors.

III.   The common law rule of damages in cases of injury to riparian

rights, that a party is entitled to a verdict, though no actual damage is proven, where the act complained of, if acquiesced in, would hazard or destroy a right, has no application.   The ownership of the land is the foundation and the reason of this rule ; and there being no ownership of the land, through which the ditches in the present case run, the rule does not apply.   The right, is the right to use and enjoy a given quantity of the waters of a stream at a given place, occupied or owned, and so long as the appropriator obtains and does actually enjoy that quantity at such place, he cannot complain though another alters somewhat the water's course in arriving at the place of use.   If the ditch owner, who gets his full quantum where he uses it, can recover merely because the water is not permitted to flow to him all the way through the channel dug by himself, he can, on the same principle, recover for any diversion from the natural channel above his ditch, though he gets and uses his full measure where he desires it.   But this proposition has been overturned by this Court.   (*Bear River and Auburn C. and W. Co.* v. *York Mining Co.* 7 Cal.)

The right to water is not acquired simply by cutting a ditch, and diverting the water from its natural channel; but, besides acts of this nature, to constitute an appropriation the water must be diverted for some useful purpose.   (*Maeris et al.* v. *Bicknell*, 7 Cal.)

The right to the channel, selected for the purpose of conveying the water, is not an exclusive right; but such channel may be used by another, at times when no deprivation of water results.   This proposition has been clearly announced by this Court.   (*Hoffman et al.* v. *Stone et al.* 7 Cal. 46 ; see also, *Cooper* v. *Hall*, 5 O. 321 ; *Palmer* v. *Mulligan*, 3 Caine, 314 ; *Williams* v. *Morland*, (9 E. C. L. R.) 2 Barn. & Cress. 908 ; *Tyler* v. *Wilkinson*, 4 Mason, 401 ; *Warring* v. *Martin*, Wright's O. 381.)

If the appropriator, by constructing a ditch, digging a trench or circling the hills with a wooden flume for an aqueduct, thereby becomes the owner of the land over which the aqueduct passes, the rule of damages invoked in this case would apply, and any unauthorized entry upon or use of such land, or diversion of water from it, though unattended by actual damage, would entitle the owner to a verdict.   But not, thereby, becoming the owner of the land over which his aqueduct passes, so long as the appropriator receives his quantum of water on the premises occupied by him, for selling water or for mining—so long as it flows uninterruptedly to him, though it may not

Kidd *v.* Laird.

touch the soil selected as the channel, he is not injured, and cannot recover.

An appropriator may change the head of his ditch or the point of tapping the stream, where the same can be done without injury to another or others prior in their locations to such change.    (*Lathrop et al.* v. *Hassim et al.* 6 Cal.—Omitted in published report.)

An appropriator may change the place of use, by extending his ditch or by constructing lateral ditches, &c.    (*Park et al.* v. *Kilham,* 7 Cal.)

The doctrine is well settled, that where one acquires right to a given quantity of water, a change in the mode and object and place of use is justifiable, where such change is not injurious to those whose interests are involved.  (Ang. on Water Courses, sec. 227–228 ; *Bullens* v. *Runnels,* 2 N. H. 255 ; *Johnson* v. *Rand,* 6 Id. 22 ; *Whittier* v. *The Cocheco Man'fg. Co.* 9 Id. 454 ; *Rogers* v. *Bruce et al.* 17 Pick. 184.)

IV.   The verdict of the jury, as to the original capacity of the Deer Creek and Coyote ditches, limiting them to one hundred inches each, is final.

*Mc Connell & Niles,* in reply.

1.  The statement on motion for a new trial is signed by the Judge, and is hence a part of the record, and no formal certificate is necessary.

2.  Respondents' proposition, that the rules of the common law do not govern water rights in this State, is untenable.   There being no legislation on the subject, the common law must be the rule of decision. The facts are new, and require a proper application of the law, but the principles are old, and just as applicable to water rights in the mining region of this State, as to the same rights in England or Virginia.

The law of " riparian ownership " has been in one case held as strictly as at common law.   (*Crandall* v. *Woods.*)   Blackstone himself states the principle of our decisions when he says, that the first occupant or appropriator of water, is entitled to it over those who come after him.   (2 Blac. Com. 14.)   To this effect, were all the older English decisions.   More recent cases require the occupancy to continue twenty years, as against the owner of the soil.

3.  The principle contended for by respondents, that the right to the water in the mining region depends on the occupancy of public land, embraces the whole law of " riparian ownership ; " for by a riparian right, is meant, simply, that the owner of the soil is entitled to use the

water as an incident to the soil; and the occupant of public land is considered as the owner. (3 Kent, 439–440.) And yet respondents insist that the law of "riparian ownership" does not apply in the mines.

But even respondents' doctrine has nothing to do with this case, because neither plaintiffs nor defendants are occupants of public land, except the small portion covered by their ditches; they neither own nor claim any land through which Deer creek runs.

The right to divert water by means of ditches and aqueducts, has no connection with the right to water acquired as an incident to the soil. The one, is acquired by use and appropriation; the other, passes as one of the natural incidents to the land. In one case, the water itself is used; in the other, its momentum.

Again: the idea that a ditch constructed through a man's claim becomes as an "artificial water course," an incident to the claim, has nothing to do with the case, because defendants have no claim; and nothing to do with the questions involved here, which relate exclusively to the nature of the property a man may acquire in flowing water.

Respondents, to show that they had a right to divert the water to which, as owners of the "Gold Flat ditch," they were entitled, through "Laird's new ditch," now claim to own a quantity of the water of Deer creek. They compare a stream in the mining region to a "cistern, tank," containing water "subject to be appropriated." Now, water in a "cistern," is already appropriated. Running water is subject to appropriation, but is not actually appropriated until diverted from the stream into artificial works.

But a miner has no more a defined and separate property in the water of a stream, before it is diverted, than a farmer.

The miner's right, as an incident to his claim, respondents say, is " to have a given quantity of water at the place for use, or for marketing, as an incident to his possession there." But, in this case, the lower *termini* of the "Gold Flat" ditch, and of "Laird's new ditch," are miles apart. So that, conceding the doctrine, it cannot avail, as water flowing through the latter ditch would be carried to a distant point.

In addition to the authorities cited in our first brief, to show that no man can have an exclusive right to any given portion of flowing water, that it is common, and that the riparian owner has only a right to its momentum, and its use to satisfy his natural wants, we cite—3 Kent, 439–440, 445; Angell on Water Courses, 10, 14, 18; Vattel's Law of Nations, ch. 20, 109, ed. 1852; Domat's Civil Law, sec. 416,

of Things Public; *Sampson* v. *Hoddinott*, 1 J. Scott, N. S. vol. 87, E. C. L. 590–612; *Embrey* v. *Owen*, 6 Exq. R. Wels. Hurls. & Gor. 353; *Wood* v. *Wand*, 3 Exq. R. 748

Cope, J. delivered the opinion of the Court—Field, C. J. and Baldwin, J. concurring.

The objection to the authentication of the statement on the motion for a new trial, is not well taken. The statement is signed by the Judge, and the minutes of the Court show that it was used on the hearing of the motion. No mode of authentication is pointed out by the statute, and any satisfactory evidence that the statement has been examined and approved by the Judge, is sufficient. This evidence, must, of course, appear in the record, in some legitimate and proper form.

This is an action to recover damages for the diversion of water from Deer creek, in Nevada county. The complaint sets forth that the plaintiffs are the owners of two certain ditches, by means of which they appropriated the water of that stream for mining purposes, and that the defendants wrongfully diverted such water, and deprived the plaintiffs of the use of the same, to their damage, etc. The answer admits the existence and ownership of these ditches, but denies that the plaintiffs appropriated the whole of the water of the stream, and denies that the defendants diverted any portion of the water to which the plaintiffs were entitled. The answer states, among other things, that the defendants are also the owners of certain ditches, by means of which they appropriated the surplus water of the stream, over and above the quantity appropriated by the plaintiffs; that neither of the plaintiffs' ditches, as originally constructed, possessed the capacity to convey more than one hundred inches of water; and that since the appropriation by the defendant, these ditches have been greatly enlarged, and their capacity materially increased. It states, further, that the plaintiffs are the owners of certain other ditches tapping the stream at different points above the ditches mentioned in the complaint, and that at the time during which it is averred that the defendants wrongfully diverted the water, the plaintiffs were themselves diverting, through such other ditches, the entire quantity to which they were in any manner entitled. The answer contains several other defenses, but a particular reference to them is unnecessary for the purposes of this opinion.

The ditches from which it is claimed that water has been improperly diverted by the defendants are situated on the north side of Deer creek—one of them is called the Deer Creek ditch, and the other the Coyote ditch. The other ditches belonging to the plaintiffs are; 1st. The Deer Creek Mining Co. ditch, on the south side of the stream; 2d. The Big Snow Mountain ditch, on the north side of the stream; and, 3d. The Little Snow Mountain ditch, on the same side. These ditches tap the stream in the order above enumerated. The defendants' ditches are: 1st. The ditch known as Laird's Gold Flat ditch, situated on the south side of the stream, below all the ditches of the plaintiffs; and, 2d. Laird's new ditch, on the north side of the stream, between the plaintiffs' Coyote ditch and their Big Snow Mountain ditch. The diversion of water through the latter ditch of the defendants constitutes the cause of action stated in the complaint.

The learned Judge before whom the case was tried in the Court below, in overruling the motion for a new trial, placed his decision upon the ground that the jury were authorized to infer from the evidence that the plaintiffs themselves had diverted the water to which they were entitled from their Deer Creek and Coyote ditches by means of their other ditches above. The counsel for the appellants, in referring to this decision and the reason for it, say: " We differ materially and radically from the learned Judge upon the character of the evidence in regard to damages; but the difference arises from the different points of view from which we look at the question. If the evidence respecting the Gold Flat ditch was, as held by his Honor, properly admitted, then, perhaps, some portions of the testimony respecting damages might be considered as conflicting; but if, as we contend, that evidence ought to have been excluded, as improper, there is no conflict whatever. No one, not even the respondents, will pretend to say that we did not establish, by uncontradicted proof, that Laird's new ditch had frequently taken water from the creek when we were in actual need of the same water to fill our Deer Creek and Coyote ditches. Their answer to this proof consists, not of a denial of its truth, but of an attempt to show that we had diverted all the water to which we were entitled, by means of the Deer Creek Mining Co.'s and the Snow Mountain ditches. But both of the last named ditches are, as we have very conclusively shown, prior in date of construction to Laird's new ditch, and the Deer Creek Mining Co.'s ditch has priority over the Gold Flat ditch, so that, after all, the respondents' own argu-

ment necessarily has the effect to limit the controversy as respects dam ages to the Snow Mountain and Gold Flat ditches. Of course, then, if our views in regard to the Gold Flat ditch are correct, this hypothesis of the defendants falls to the ground, and the single question remains to be determined, whether the defendants' new ditch did or did not, within the period charged in the complaint, divert water to which the plaintiffs' Deer Creek and Coyote ditches had the preference, and on this point, leaving the Gold Flat ditch out of sight, there is no dispute or controversy." This quotation from the brief of appellants' counsel presents fully and fairly their view of the case, and avoids, to a great extent, the necessity for a critical examination and elaborate review of the evidence. Their position is simply this: that all the evidence in regard to the Gold Flat ditch was improperly admitted, and that reject-ing this evidence, there was no conflict of testimony upon the question of damages. If the evidince was admissible, it is upon their own showing, sufficient to support the verdict.

The object of this evidence was to show that the defendants were en-titled to a certain quantity of water for their Gold Flat ditch, and that they diverted this quantity through their new ditch instead of the other, which it was claimed they had the legal right to do. The evidence hav-ing been admitted, the Court instructed the jury in effect, that a person entitled to divert a given quantity of the water of a stream, may take the same at any point on the stream, and may change the point of diversion at pleasure, if the rights of others are not injuriously affected by the change. The following instruction, asked by the plaintiffs, was refused: "If the jury believe from the evidence that the dam of the the defendants' Gold Flat ditch is below the dams of the Deer Creek and Coyote ditches, and that the dam of the defendants' new ditch is above the dams of the Deer Creek and Coyote ditches, then, even if the defendants had a prior right to any of the waters of Deer Creek for their Gold Flat ditch, they could not substitute their new ditch for their Gold Flat ditch, and use the water to which, as owners of the Gold Flat ditch, they were entitled, in such new ditch." As the instruction given by the Court embodies the principle upon which this evidence was admitted, and upon which the instruction asked by the plaintiffs was refused, a determination of the correctness of that instruction disposes of the whole question.

This Court has never departed from the doctrine that running water, so long as it continues to flow in its natural course, is not, and cannot

be made the subject of private ownership. A right may be acquired to its use, which will be regarded and protected as property; but it has been distinctly declared in several cases that this right carries with it no specific property in the water itself. We are not called upon to determine the character of the property which the owner of a ditch has in the water actually diverted by and flowing in his ditch. With reference to such water, his power of control and right of enjoyment are exclusive and absolute, and it is a matter of little practical importance whether, in a strict legal sense, it be or be not private property. In regard to the water of the stream, his rights, like those of a riparian owner, are strictly *usufructuary*, and the rules of law by which they are governed are perfectly well settled.

It is contended that the principle embodied in the instruction is in direct conflict with this doctrine, and that it can only be maintained upon the theory of a private ownership in the water itself. This position is clearly untenable. If the Government, which in this instance is the riparian proprietor, had granted to the defendants the right to divert from the creek a given quantity of water, without restriction as to the place of diversion, it is clear that the right could be exercised at any point on the stream, though the effect of the grant would not have been to convey any property in the *corpus* of the water, for no such property is vested in the Government. It is obviously immaterial whether the right was acquired under an express grant, or by prescription, or rests in the parol license, or the presumed consent of the proprietor. The difference relates to the mode of determining the existence and extent of the right, and not to the manner of its exercise and enjoyment. Angell, in his work on water courses, in treating of easements acquired by prescription, says: "The extent of the presumed right is determined by the user, on which is founded the presumed grant, the right granted being commensurate with the right enjoyed." (Ang. on Water Courses, sec. 224.) But he also says, that "although the extent of the right is to be measured and regulated by the enjoyment upon which the right is founded, the party is yet allowed freedom in the manner of exercising it." (Id. sec. 226.) "In this country the doctrine is well settled," says the same author, "that where a right has been acquired by virtue of twenty years' enjoyment to use a certain quantity of water, a change in the mode and objects of use is justifiable; and here, as in England, the only restriction is, that the alterations made from time to time shall not be injurious to those

Kidd *v.* Laird.

whose interests are involved." (Id. sec. 227.) "All that the law requires is, that the mode or manner of using the water should not have been materially varied, to the prejudice of others." (Per Chancellor Walworth, in *Belknap* v. *Trimble,* 3 Paige Ch. R. 605.) The case of *Whittier* v. *The Cocheco Manufacturing Co.* (9 N. H. 454) is directly in point. It was there decided that a change may be made in the place, as well as in the mode and objects of the use, if the quantity of water used is not increased, and the change is not to the prejudice of others. It was held that a party who had acquired by prescription a right to take a certain quantity of water at a particular dam, might open his gates and draw that quantity, without using it there, in order to use it at other works below on the same stream. These authorities show conclusively, that in all cases the effect of the change upon the rights of others is the controlling consideration, and that in the absence of injurious consequences to others, any change which the party chooses to make is legal and proper. It follows that in this case the law was correctly given by the Court, unless the rights of the parties are distinguishable from the class of rights to which these authorities refer, and the same rules and principles are not applicable. Upon this subject it is only necessary to consider, that none of the rights involved in this controversy are founded upon a legal title, and that the safety and security of the parties require that the rights of each, as fixed by the priority and extent of their respective appropriations, should be regarded as perfect and absolute as if they had been acquired by prescription, or were held under an express grant from the riparian owner. This is the only reasonable rule which can be adopted in cases of this character; and it is the more reasonable, as it enables us to test the rights of parties by certain well settled principles of law, instead of relying upon our own unaided reason and judgment.

The next most important question in the case, and the only additional one which we propose to consider, relates to the effect of the verdict. It is contended that under the issues presented by the pleadings, the effect of the verdict is to establish the original capacity of the plaintiffs' Deer Creek and Coyote ditches at one hundred inches of water, and to limit the right of diversion through each of those ditches to that quantity. The evidence shows very clearly that their capacity was much greater, and if the effect of the verdict were as contended, it would be a great hardship to the plaintiffs to permit it to stand. But we think that such is not its legal effect, and even if it were, we do not

Kidd v. Laird.

see upon what principle we could disturb it.    There were several sep-
arate and distinct defenses, each of which was sufficient to defeat the
action.    These defenses were submitted to the jury, together with the
evidence in support of each, and it is impossible for us to determine
upon what particular issues the verdict was found.    Nor is it necessary
that we should do so, for if it be right as to one, it cannot be set aside,
though wrong as to all the others.    " If there be two issues," says
Washington, J. in *Lonsdale* v. *Brown*, (4 Wash. C. C. 148) " or issues
on two counts, and the verdict be not contrary to evidence as to one of
them, the Court will not grant a new trial, though it be contrary to evi-
dence as to the other, for since the verdict is right in part, the Court
will not set it aside."    (See also Grah. & Wat. on New Trials, 1339 ; 1
Barnes, 9, 317, 333 ; and 9 Bac. Ab. 600, Bouv. ed.)

We think this verdict cannot in any event be disturbed, but we are
of opinion that its legal effect is different from that attributed to it by
the plaintiffs.    The rule is, that a verdict found on any fact or title dis-
tinctly put in issue, is conclusive in another action between the same
parties or their privies, in respect of the same fact or title.    (2 Wheat.
Selw. 1356 ; *Outram* v. *Morewood*, 3 East. 346 ; *Vooyht* v. *Winch*, 3
Barn. & Ald. 662.)    It is not sufficient that the particular fact or title
is put in issue.    It must be tried by the jury, and constitute the basis
and foundation of the verdict.    It must be relevant and material, and
unless specially found must have been necessarily passed upon by the
jury.    (*Burt* v. *Sternburgh*, 4 Cow. 559 ; *Gardner* v. *Buckbee*, 3 Id.
120.)    There is nothing in this case showing that the verdict turned
upon the question of the capacity of the plaintiffs' ditches, and it is a
reasonable inference, from the evidence, that the issue upon that point
was entirely disregarded.    It was not necessarily considered, and as the
verdict is general, its effect is limited to such issues as necessarily con-
trolled the action of the jury.    Upon the question of the capacity of
these ditches the jury could have found for the plaintiffs, and still justly
and properly concluded that they were not entitled to damages.    To hold
that upon such a question the verdict is conclusive of the rights of the
parties, would, we think, be a plain perversion of the law.

The view we have taken of the case renders it unnecessary to con-
sider any other questions discussed in the briefs of counsel.

Judgment affirmed.