## No. 24077

Metropolitan Denver Sewage Disposal District No. 1, a district; and City and County of Denver, acting by and through its Board of Water Commissioners v. The Farmers Reservoir and Irrigation Company, a Colorado corporation; The Burlington Ditch, Reservoir and Land Company, a Colorado corporation; and The Henrylyn Irrigation District, a district

(499 P.2d 1190)

Decided June 19, 1972.                    Rehearing denied July 10, 1972.

Saunders, Dickson, Snyder & Ross, P.C., Glenn G. Saunders, George L. Zoellner, for plaintiffs in error City and County of Denver.

Inman, Flynn & Coffee, P.C., John J. Flynn, Jr., Robert D. Inman, James D. Geissinger, for plaintiff in error Metropolitan Denver Sewage Disposal District No. 1.

Akolt, Shepherd, Dick & Rovira, Robert A. Dick, Stuart S. Gunckel, Miller & Ruyle, David J. Miller, for defendants in error.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

The defendants in error (plaintiffs) have decreed rights for irrigation purposes out of the South Platte River. In about 1937 Denver constructed a sewage treatment facility known as the Denver Northside Plant. Effluent from this plant was discharged into the South Platte River above the common headgate of the plaintiffs. Beginning in about 1966 the effluent from Denver's sewage was placed in the river

downstream from this headgate. The plaintiffs brought before the court this declaratory judgment action asking, among other things, that it be adjudged that the plaintiffs are entitled to have the effluent placed in the river above their headgate. The trial court ruled in favor of the plaintiffs. We reverse.

The parties placed this matter before the trial court upon an agreed statement of facts.

Counsel for Denver stated that the appropriations of the plaintiffs were made before and after the commencement of the Northside Plant operations. However, the priority dates listed in the briefs and statements of fact are all prior to 1937 (being 1885 to 1922), and thus we assume that there are other later priority decrees not mentioned. We also assume that, prior to the operation of the Northside Plant, Denver sewage reached the river above the headgate.[1]

Nearly every decree for South Platte River water diverted downstream from Denver is dependent for its supply upon return flow of waste and seepage waters. See *Comstock v. Ramsay,* 55 Colo. 244, 133 P. 1107 (1913). The only inference to be drawn from the statement of facts is that, absent either effluent discharge above the headgate or change of the plaintiffs' point of diversion to a place below the plant, the plaintiffs' decrees will be substantially unfilled.

When constructed, the Northside Plant met existing health requirements. It subsequently became inadequate due to population growth and higher health standards. As a result, the plaintiff in error Metropolitan Sewage District No. 1 (Metro) was created and its plant went into operation in about 1966 at a location one and one-half miles downstream from the plaintiffs' headgate. Under contract, Metro receives raw and preliminarily treated sewage from Denver and other municipalities and districts. After treatment, the effluent from Metro's plant is discharged into the South Platte River at a point near the plant.

1. This was affirmatively proved in Denver v. Fulton Company, 179 Colo. 47, 506 P.2d 144, announced contemporaneously with this opinion.

Plaintiffs brought the action solely against Metro and the contractor, who at the time of commencement of the action was constructing Metro's plant. A dismissal was entered later as to the contractor upon motion of the plaintiffs. Denver was permitted to intervene. The defendants-appellees in *Denver v. Fulton Company* mentioned in footnote 1 also intervened, but withdrew when it was stipulated that the issues concerning transmountain water would not be before the court here and would be litigated in *Fulton Company.*

The effluent with which we are concerned here is solely from water arising in the South Platte watershed, which has been acquired by Denver, and, after use within Denver, has been transported through Denver's sewer system to Metro's plant. Not involved is Denver-owned water which reaches the Metro plant through sewers other than those of Denver. Also, not involved is transmountain water brought from Colorado River tributaries west of the Continental Divide to the Denver area.

While permitting other municipal entities to use its water, Denver has attempted to retain control over the water following those uses, and those portions of this water which return to Denver's sewer system may well be only in the same category here as Denver-appropriated water used in Denver and returning via Denver's sewer system. In perhaps a super-abundance of caution, however, we exclude all Denver water used under contract with other municipal entities, regardless of how it returns to the stream.

I.

Under the agreed facts and the contractual provisions between Denver and Metro, it is plain — and we hold — that, once Metro completes treatment of Denver sewage, the nature and extent of Denver's control over the resulting effluent is the same as if Denver alone had treated it. The plaintiffs appear to argue that, since Metro is an entity entirely separate from Denver and since it dumps the effluent into the river, Denver is not involved and any rights of plaintiffs are to be asserted solely against Metro. The trial court rendered judgment in favor of the plaintiffs and solely

against Metro. In its oral announcement it stated that, being separate entities, possession by one would not be possession by all.[2] Also, in its oral pronouncement the court made the following statement:

"Metro. . . can't lawfully intercept water returning to the river and appropriate and thereby obtain in 1965 a priority of use, senior to the Plaintiffs in this case, whose agreed rights have been beneficially applied for a period of more than 50 years."

We view the matter differently.

In our view, the possession of the sewage in effluent by Metro is in the nature of possession by an agent, an agent for Denver. While no doubt Metro is an indispensable party here, the real party in interest is Denver. Whatever disposition Denver may make of the effluent, Metro can make; and whatever disposition Denver cannot make is proscribed to Metro.

## II.

Since the water originates in the South Platte watershed, by reason of *Pulaski v. City of Trinidad,* 70 Colo. 565, 203 P. 681 (1922), no one questions that the effluent must be returned to the stream without disposition to others by Denver.

We sense an underlying sentiment (or hope) by Denver that the plaintiffs may have the effluent involved to the extent of their decrees. Be that as it may, it is apparent that the parties are concerned primarily with the question of who shall bear the cost of transporting the water from the new place of discharge to the initial (common) section of the plaintiffs' ditch. Before proceeding further, we wish to emphasize that we are not expressing any opinion on the right of plaintiffs to the effluent. Rather, we are concerned with whether Denver, acting through Metro, may change its point of effluent discharge into the stream at the Metro plant

2. The trial court made no independent conclusions of law, but rather made its conclusions by "incorporating and including therein as if set forth in full" the plaintiffs' briefs. Even if we had these briefs before us — which we do not — this is not approved practice.

with impunity as against the plaintiffs' objection. Holding that Denver may do so ordinarily would lead us to a discussion of whether a change of point of diversion by plaintiffs is in order. That question, however, was removed from the consideration by the trial court and consideration here by the following provision of the agreed statement of facts:

"11. The place of discharge for the Metro-Denver Plant is below the 'common headgate' such a distance that effluent enters the South Platte River at a place where diversions for the benefit of the 'common headgate': could only be made physically, by moving the 'common headgate' to a place on the South Platte River below such place of discharge, with a ditch relocation, or by pumping the water up and into a place in the Burlington Ditch [the initial common ditch of the plaintiffs] below the 'common headgate." Whether either physical procedure would require the securing of new or alternate points of diversion under Colorado Statutory law is not involved in this proceeding."

### III.

In its oral announcement, the trial court stated in effect that the rules governing change of *point of return* (to the stream) are the same as those governing change of *point of diversion,* citing *Brighton Ditch Co. v. Englewood,* 124 Colo. 366, 237 P.2d 116 (1951), and *Fort Collins Co. v. Larimer and Weld Co.,* 61 Colo. 45, 156 P. 140 (1916). An appropriator may not change his point of diversion except upon conditions which eliminate injury to other appropriators. *See Farmers Co. v. Golden,* 129 Colo. 575, 272 P.2d 629 (1954) and cases cited therein. The plaintiffs argue similarly that they are entilted to conditions on the stream as they have existed, citing *Farmers Co. v. Golden, supra; Monte Vista Co. v. Centennial Co.,* 24 Colo. App. 496, 135 P. 981 (1913); *Farmers Co. v. Wolf,* 23 Colo. App. 570, 131 P. 291 (1913); and *Vogel v. Minnesota Co.,* 47 Colo. 534, 107 P. 1108 (1910). We cannot agree with the argument of the plaintiffs and the conclusion of the trial court. The cases cited by them and listed above are all change of point of

diversion, and not change in point of return, cases. To us, they are not persuasive. Plaintiffs also cite *Comstock, State Engineer v. Ramsay,* 55 Colo. 244, 133 P. 1107 (1913), which involves the lack of right to intercept waste water which is proceeding toward the stream, and does not involve the right to change the point of return.

Changes of points of return of waste water are not governed by the same rules as changes of points of diversion. Conceivably, there may be instances (perhaps in the case of power water) in which a change of point of return may be enjoined, but this is not one of them. In *Green Valley Co. v. Schneider,* 50 Colo. 606, 115 P. 705 (1911), the Tegeler lateral carried waste water which plaintiff used. It was there held as follows:

"Plaintiff's rights were limited and only attached to the water discharged from the Tegeler lateral, whatever that happened to be, after the defendants and cross-complainants had supplied their own wants and necessitites. This does not vest her with any control over the ditches or laterals of appellants, or the water following therein, nor does it obligate appellants to continue or maintain conditions so as to supply plaintiff's appropriation of waste water at any time or in any quantity, when acting in good faith. *Mabee v. Platte Land Co.,* 17 Col. App. 476; *The Fairplay Hy. M. Co. v. Weston,* 29 Colo. 125." *See Tongue Creek v. Orchard City,* 131 Colo. 177, 280 P.2d 426 (1955); and *Burkart v. Meiberg,* 37 Colo. 187, 86 P. 98 (1906). We believe that it follows from this determination that there is no vested right in downstream appropriators to maintenance of the same point of return of irrigation waste water.[3]

At least in the absence of bad faith or of arbitrary or unreasonable conduct, the same rule should be applicable to sewage waste or the effluent therefrom of a municipality or sanitation district. Any question of arbitrary or unreasonable conduct here was removed by the agreed statement of facts.

3. This statement should not be construed as an expression concerning any right or lack of right to enlarge the use of irrigation water. *See Fort Lyon Canal Co. v. Chew,* 33 Colo. 392, 81 P. 37 (1905).

It was there stipulated that the Metro plant was placed at a location gravitationally below the Northside Plant and "was selected on the basis of economic feasibility and is a normal engineering selection. . . ." We hold, therefore, that the plaintiffs may not interfere with Denver's change of point of return.

It has not been argued that it may be against public policy for appropriators to prevent change of point of return of sewage effluent, *i.e.,* the vitiation of the public health in a burgeoning urban area. We, of course, make no ruling in this respect, but think it well to suggest that possible public policy questions are worth expression.

We feel we should remark that the General Assembly may well wish to change, prospectively at least, the rule we here announce as to change of point of return.

## IV.

On May 2, 1968, the trial court entered a minute order, which awarded judgment in favor of the plaintiffs and set a future date for the hearing on the amount of damages to which the plaintiffs might be entitled. Under date of July 29, 1968, Denver, Metro and the plaintiffs entered into an agreement. This recited that Denver had constructed a pumping facility capable of delivering effluent from the Metro plant into the Burlington Ditch. The agreement provides among other things for the ultimate vesting of title to the pumping facility, for the payment of the cost of the facility, and for the payment of operational expenses connected therewith. The identity of the party or parties which obtain title and make payments, and rather complex arrangements relating thereto, are dependent upon the ultimate outcome of the instant case and of *Denver v. Fulton Company, supra,* footnote 1. The agreement cannot be completely effected until there has been ultimate disposition of this and the *Fulton* case.

The fact that the agreement had been executed was brought to the court's attention and on August 27, 1968 it ordered, "That the Court resolves the issue of damages by incorporating as an Order of Court the Agreement of the

parties dated July 29, 1968."

As a result of our disposition of the present case, the effect of the agreement will be entirely different than if we had affirmed the trial court. The rights and responsibilities of the parties presumably can now be determined under our disposition here and our contemporaneous disposition of *Fulton*. Because consideration of the agreement should be started anew, we hold that the court erred in its order of August 27, 1968 and that all orders of the trial court relating to damages should be vacated.

The judgment of the trial court is reversed and the cause remanded for any appropriate further proceedings.

MR. JUSTICE KELLEY not participating.

MR. JUSTICE ERICKSON dissenting.

MR. JUSTICE ERICKSON dissenting.

I respectfully dissent.

The record reflects that plaintiffs have appropriative rights to water from the South Platte River and that plaintiffs' point of diversion is located downstream from Denver. Plaintiffs' water rights are based on decrees with priority dates ranging from 1885 to 1922. Like nearly all decreed rights to water diverted from the South Platte River downstream from Denver, plaintiffs' rights historically were dependent to a large extent upon return flow of waste and seepage waters. *See Comstock v. Ramsay*, 55 Colo. 244, 133 P. 1107 (1913).

Prior to the commencement of operations at the Northside Plant in 1937, Denver sewage contributed to the return flow relied upon by plaintiffs. During the period that the Northside Plant was in operation, Denver sewage was still available to satisfy plaintiffs' decreed rights, since the effluent from the Northside Plant was discharged into the river above plaintiffs' headgate and was part of the stream. More recently, however, Denver's sewage has been processed at the Metropolitan Sewage Plant and the effluent has been discharged into the river below plaintiffs' headgate. Because of the change in the point of return, plaintiffs' decrees are

now substantially unfilled.

Without doubt, Denver is responsible for the changed conditions on the river which have caused the injury sustained by plaintiffs. Whether or not Denver is obligated to take such steps as may be necessary to prevent injury and to protect the plaintiffs is dependent upon the nature and extent of the rights acquired by the plaintiffs pursuant to their decrees.

Plaintiffs contend that as appropriators with decreed rights to return flow waters of the South Platte River, they have vested rights in the continuance of conditions on the South Platte River as they existed at the time they made their appropriations. *Denver v. Colorado Land & Livestock Co.,* 86 Colo. 191, 279 P. 46 (1929); *see Farmers Highline Canal & Res. Co. v. Golden,* 129 Colo. 575, 272 P.2d 629 (1954); *Vogel v. Minnesota Canal & Res. Co.,* 47 Colo. 534, 107 P. 1108 (1910); *Handy Ditch Co. v. Louden Irr. Canal Co.,* 27 Colo. 515, 62 P. 847 (1900). *See also A Survey of Colorado Water Law,* 47 Denver L. J. 226, 249, 251 (1970). They argue that any change in the exercise of a water right which alters the existing conditions on the stream to the prejudice of an appropriator with a decreed right to water from the stream is illegal. The majority of the court does not dispute the applicability of the principle of law relied upon by plaintiffs when gauged by our cases which relate to change in point of diversion. However, the majority opinion holds the principle to be inapplicable to this case because this case involves a change in point of return.

One of the earliest cases which considered the relative rights of appropriators was *Sieber v. Frink,* 7 Colo. 148, 2 P. 901 (1883). In *Sieber v. Frink, supra,* the question was whether an appropriator could change his point of diversion without affecting his right of priority, where no change was made in the quantity of water diverted and no one was injured by the change. The court held that such a change was permissible and thereby dispelled the view that any change in the exercise of a water right was illegal.

Thereafter, in *Fuller v. Swan River Placer Min. Co.,* 12

46

Colo. 12, 19 P. 836 (1888), the court was presented with the question of whether a change in point of diversion could be made for the purpose of changing the place of use. Again, the court held that such a change was permissible, as long as other appropriators from the same water source were not injured by the change. In reaching its conclusion, the court relied on *Kidd v. Laird,* 15 Cal. 161 (1860), and said:

"We think that the rule announced in Kidd v. Laird, 'that, in the absence of injurious consequences to others, any change which the party chooses to make is legal and proper,' is the only rule under which the rights of the prior appropriator can be fully exercised, and his rights, and the rights of all other persons, fully protected."

Although the *Kidd* case involved a change in point of diversion and a change in place of use, it is clear from the language of the court and the authorities cited that the rule announced therein was not limited to cases involving a change in point of diversion. Rather, the court set forth guidelines applicable to any change which an appropriator might make in the mode or manner of use of his water right.

By adopting the rule announced in the *Kidd* case, the Colorado court greatly expanded the right of an appropriator to change the mode or manner in which he utilized his water right. At the same time, the court continued to subject any change in the exercise of a water right to the limitation that such change could only be undertaken in the absence of injurious consequences to other appropriators with vested rights. The conclusion to be drawn from the *Kidd* case is that cases such as this, which involve a change in point of return are not to be resolved on the basis of the change made. Rather, "the effect of the change upon the rights of others is the controlling consideration...." *Kidd v. Laird, supra.* Failure to apply the rule set forth in the *Kidd* case, and later followed in the *Fuller* case and in *Strickler v. Colorado Springs,* 16 Colo. 26 P. 313 (1891), discredits the claim made by the court in *Fuller* that the rule adopted is the only rule under which the rights of all persons can be fully protected.

The majority opinion has concluded that there is no vested

right in downstream appropriators to the maintenance of the same point of return for sewage waste or effluent that has become part of the stream. In my opinion, the cases cited to reach this result are distinguishable and do not support the conclusions. None of the cases which are cited in the majority opinion involved, in my opinion, downstream appropriators who had decreed rights.