The STATE of Wyoming, By and Through George CHRISTOPULOS, State Engineer of the State of Wyoming, and Robert Sundin, Director of the Department of Environmental Quality, Appellants (Defendants below),

and

Albert Glassburn, Calvin Fogg, John Bauman, K. D. Knauss, Marvin McNally, Dean Fogg, Henry Miller and Darrell Naffziger, Appellants (Intervenors below),

v.

HUSKY OIL COMPANY OF DELAWARE, Appellee (Plaintiff below).

No. 4780.

Supreme Court of Wyoming.

Feb. 17, 1978.

V. Frank Mendicino, Atty. Gen., Jack D. Palma, II, Asst. Atty. Gen., Cheyenne, for appellants-defendants.

Stanley K. Hathaway, Hathaway Speight & Kunz, Cheyenne, for appellants-intervenors.

James R. Learned, Cheyenne, and Arthur H. Nielsen, Salt Lake City, Utah, for appellee.

Nick Kalokathis, Lathrop & Uchner, Cheyenne, for amicus curiae City of Cheyenne by and through its Board of Public Utilities.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

McCLINTOCK, Justice.

George Christopulos, state engineer of the state of Wyoming (hereinafter referred to as the state engineer) and Robert Sundin, director of the department of environ-

mental quality (DEQ) appeal from the decision of the district court of Laramie County, Wyoming granting summary judgment in favor of Husky Oil Company of Delaware (Husky), declaring that that company's plan to impound and recycle effluent water, being the water remaining after use in its refinery process of water which it purchases from the city of Cheyenne, Wyoming, is not subject to the jurisdiction and control of the state engineer and the Wyoming state board of control (board). The summary judgment also declared that the proposed use did not infringe upon any rights of downstream water appropriators (intervenors) who had been permitted to intervene in the action, file answer and appear as active litigants. The city of Cheyenne, the original appropriator of the water sold to Husky, was not made a party to the action and no other party has sought its joinder. The city, acting through its board of public utilities (city), did not seek to intervene but claimed interest in the outcome and was granted leave to file a brief in the lower court as *amicus curiae*, which same privilege was extended to it in this court. Upon careful consideration of the briefs and arguments upon the motions for summary judgment, a majority of the court are of the opinion that both the state board of control and the city of Cheyenne are necessary and indispensable parties to the action if the issues asserted are to be adjudicated and that the cause should not proceed without their joinder. We are also of the opinion that after their joinder there should be a full factual trial upon the claims of all parties, including the intervenors, before a final judgment is entered in the matter.

We take as a factual basis for the views herein expressed the following: The city has legally adjudicated water rights (1) to take, store and use virtually all the water developing in the Crow Creek drainage, a stream having its source in the area west of Cheyenne and flowing through that city on down to lands which are owned and irrigated by the intervenors; (2) to take, store and use water produced through wells drilled in an area lying to the west of the city; and (3) to take, store and use a quantity of water diverted from another watershed a considerable distance from the city.[1] All of these waters are commingled in the city municipal system, treated, and then distributed to various users within and near the city. For many years Husky has purchased from the city large amounts of water which it uses in its refinery operations conducted at Cheyenne.[2] That part of the water which is used but not consumed in the refinery operations and which has to some extent been polluted by the refining process has throughout all this period of time been returned to Crow Creek and such amount as continues down that stream to lands of the intervenors has been used by them under adjudicated rights as early as 1888 and as late as 1970.[3] A permit issued by the DEQ pursuant to federal and state authority is subject to the limitation that polluted water

---

1. The record contains a summary showing the amount of water received from the various sources for the years 1970 to 1976. For the last year listed it appears that of a total of 10,500 acre feet received into the city system, 7,300 acre feet or 70% of the supply was received through tunnel from western slope, 1,700 acre feet or 16% came from the Crow Creek drainage, and 1,500 acre feet or 14% came from the wells.

2. The record discloses that during a typical period from July, 1975 to February, 1976, Husky's purchases amounted to more than 49,-000,000 gallons of water per month, of which two-thirds was used and the balance, some 16,338,750 gallons, was discharged into Crow Creek.

3. The dates of these appropriations do not appear in the record. Similarly, there is nothing in the record as to the dates of the city's respective rights, although in *Van Tassel Real Estate & Live Stock Co. v. City of Cheyenne*, 49 Wyo. 333, 54 P.2d 906 (1936) reference is made to an adjudication of the right, entered in 1888, that awarded the city 12,481 cubic feet of water per second of time, "a much larger amount than the stream ever carried." It is presumed that the tunnel diversion and the wells have later dates of priority, although as we shall subsequently indicate, the city has contended in its *amicus curiae* brief that such water is to be considered as developed water and not subject to the usual rules concerning return flow.

shall not be discharged into the stream after July 1, 1977. The downstream rights in part involve the direct flow of the stream but it is also claimed by intervenors that diminution of the flow of Crow Creek will have a direct and injurious effect upon ground water irrigation wells of some of the intervenors drilled in the so-called Carpenter Groundwater Control Area. At the argument hearing upon the motion for summary judgment the parties orally stipulated that for purposes of the argument only it could be considered that discontinuance of the discharge from the refinery would result in injury to the intervenors.

Husky's principal contention is that the waters in question are not "unappropriated water subject to control and jurisdiction of the State Engineer of the State of Wyoming." Its amended complaint raised the question that the state engineer was improperly asserting jurisdiction under the provisions of § 41–26, W.S.1957, requiring anyone seeking to impound the unappropriated waters of the state to apply for a permit from the state engineer. By their joint answer the state engineer and DEQ contend that Husky's plan to impound waters which historically have been returned to Crow Creek "is a change and expansion of use, involving the storage of a direct flow water right which is within the jurisdiction and control of the State Engineer *and the State Board of Control* under Wyoming law."[4] (Emphasis added) The intervenors allege that they have vested rights in that portion of the effluent waters

historically discharged into Crow Creek by the city of Cheyenne and by Husky. They also allege that Husky's plan to impound rather than return the water is a change and expansion of use and storage of a direct-flow right under the jurisdiction of the state engineer and board of control. They ask that effectuation of such plan be enjoined and that Husky be ordered to treat and purify its effluent to comply with state standards and continue to discharge it to the stream.

From the foregoing we conclude that the issue involved in the case is whether the waters so diverted, impounded, treated and distributed by the city, including the portion sold to Husky, remain "waters of the State" or "unappropriated waters of the State,"[5] subject to the jurisdiction and control of the state engineer and the board of control, acting in their respective fields of authority.[6] The further issue is whether the intervenors have acquired such vested rights in the effluent discharge after Husky's use that the plan to store proposed by Husky (presumably with the approval of the city) represents a change of use in derogation of intervenors' rights.

Husky moved for summary judgment on the ground that there was no genuine issue of fact and it was entitled to judgment as a matter of law, submitting only an affidavit of its manager concerning the purchase and use of water by Husky. The state engineer and DEQ joined to file a cross-motion for summary judgment in their favor against

4. Just what specific action the state engineer has taken or threatened is not made clear in the record. Husky refers to § 41–26, W.S.1957, relating to applications for permits to store water in reservoirs, as the basis of the state engineer's claim of authority or jurisdiction, but his answer, as well as that of the intervenors, refers to Husky's action as amounting to a change and expansion of use, which is the subject of § 41–4.1, W.S.1957, 1975 Cum.Supp. As we read the briefs, both in the district court and here, the attorney general makes no claim that § 41–26 is pertinent, and we consider the real issues to be more aptly predicated on § 41–4.1.

5. Section 1 of Article VIII of our Constitution declares "[t]he water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state" to be the property of the state. Section 2 of this article vests the board of control, under such regulations as may be prescribed by law with the supervision of the waters of the state and their appropriation, distribution and diversion.

6. Section 5 of Article VIII, vests the state engineer with "general supervision of the waters of the state." We do not think that this provision was intended to give him an unlimited and uncontrolled authority thereover, and § 41–4.1, W.S.1957, 1975 Cum.Supp., relating to change of use, refers only to the board.

both Husky and the intervenors.[7] The motion was accompanied by affidavits that there were other adjudicated rights from Crow Creek below the point of discharge of Husky's effluent, that the DEQ order did not require total impoundment as proposed by Husky, and such a system is acceptable to DEQ only if it "is legally available under all the statutes," the legality of the plan to be determined by the discharger.

The city took no part in the proceedings until after the argument upon the motions for summary judgment. The following day the city, through its board of public utilities, asked permission to appear as *amicus curiae*, for the purpose of responding to questions as to whether the board was a necessary party to the action, to what extent the state engineer had jurisdiction over the municipal use of water, and whether customers of the board had absolute control of water sold to them unless and until the water was released into the natural channel of Crow Creek. In its brief the city generally supported the position of Husky that the state engineer was without jurisdiction, claiming that the use by Husky was a proper municipal use, that the water supplied to Husky came from a source foreign to Crow Creek in which intervenors had no priority, that there was no change in use and that the city was not a necessary party. Its comments in this last respect are significant because the city takes the position that it is not a necessary party if the case is disposed of on the grounds just mentioned but if "the Court should be inclined to hold that

either 41–4.1[8] or 41–29.1[9] apply, then the Board would be a necessary party to this action." [10]

After argument and consideration of briefs submitted by all the parties, as well as the *amicus* brief submitted in behalf of the city, the court sustained Husky's motion for the reason that its plan

" * * * to impound or recycle the effluent water which the Plaintiff purchases from the City of Cheyenne and uses in its refinery process is not subject to control and jurisdiction of the State Engineer of the State of Wyoming *or the State Board of Control* and does not infringe upon any rights of the Interveners." (Emphasis added)

Section 1–1052, W.S.1957 permits an interested person whose rights, status or other legal relations are affected by a statute to have determined any question of construction or validity of the statute. This necessarily includes determination of the applicability of a particular statute to a particular set of facts. No one appears to question the applicability of the statute or its availability to Husky but § 1–1061, W.S. 1957 contains the pertinent direction that:

"When declaratory relief is sought, all persons *shall* be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." (Emphasis supplied)

All parties appear to proceed on the basis that if a change of use is to be granted or

---

7. The motion does not indicate just what kind of a summary judgment should be entered, either as against Husky or as against the intervenors. We conclude from the briefs that these state officials take the position that Husky's petition should be dismissed, leaving it to the state engineer to exercise whatever jurisdiction he may have.

[8] Section 41–4.1, W.S.1957, 1975 Cum.Supp. relates to the change of use or change of place of use and requires the "owner of a water right" seeking such change to file a petition requesting permission therefor, and as I read it is directed to the board of control. The state engineer is not mentioned in the section.

[9] Section 41–29.1, W.S.1957, 1975 Cum.Supp. permits the owner of a direct-flow right under certain conditions to store such right, first submitting an application for such right to the state engineer and obtaining approval of the board of control.

10. This quotation is from the city's brief filed in the district court. Apparently the city's counsel feels that if proper adjudications can be secured without its presence in the suit, there is no point in its being a party, but that its rights should not be adjudicated adversely without its presence. I know of no rule of law that permits a party to sit back and wait to see if he is hurt by the decision of the court and then assert an adverse interest.

denied, it would be the board of control and not the state engineer who would make the decision. While the state engineer acts in the first instance to approve or deny a permit for the impoundment of water so that his inclusion as a party defendant to the action as filed by Husky was proper, no one has pointed to any authority to be exercised by him in connection with a change or expansion of use. Under the applicable statute, § 41–4.1, W.S.1957, 1975 Cum.Supp., he has no adjudicatory capacity with respect to the question whether Husky's proposed action represents such a change or expansion of use, and if anyone other than a court has original or primary jurisdiction of that question, it is the board of control. It therefore seems clearly to come within that class of persons who have or claim an interest and it therefore necessarily follows that under the mandate of the declaratory judgment statute it *shall* be made a party. Since only the board may assert the right to adjudicate the claim of change of use contrary to Husky's position upon the broadened issues of the action, the board is the logical and only real defendant on this question. On this issue it is the board's authority which is questioned, not the state engineer's.

It is also clear that Rule 19(a) [11] requires the presence of all who have a real interest in the disposition of the case, and we cannot conceive who might be more interested in a ruling as to the power and authority of the board than the board itself. We cannot avoid the conclusion that the presence of the board is mandated both by the statute and by the rule before any declarations can be entered concerning that authority. We know of no rule which permits the state engineer, even though he is constitutionally a member of the board and is statutorily the ex officio president thereof, to represent its interests in litigation of this kind.

Even more important to us is the absence of the city or its board of public utilities as a party to the suit. Nowhere in the record or briefs do we find any contention that there has been an assignment or other transfer of any part of the city's water right or rights and it does not appear that by its purchase Husky has either temporarily or permanently succeeded to all or any part of the water right whereby this water becomes available to the city and through it to Husky. It is not inconceivable that compliance with the burden which the intervenors ask the court (or might ask the board of control) to impose upon Husky's disposition of the water which has served its purpose in the refinery process without consumption, or upon any alternative use that it might propose to make of the unconsumed water, could be sufficiently onerous to render uneconomic its purchase of water from the city. In that event negotiations for a different contract or abandonment of the existing contract of purchase could result. Termination of the contract could have serious effects upon the ability of the city to meet bond obligations and should the refinery operations be discontinued or Husky's purchase of the water terminated for any reason it would be the city that would seek a new disposition for its water, perhaps one that was completely consumptive in its use, such as furnishing water to a brewery or manufacturer of soft drinks.

On the assumption that the city and Husky seek to make a change in the use of water appropriated by the city and sold by it to Husky, it is entirely probable that the legislature has vested primary jurisdiction in the board of control to determine whether such change of use should be permitted. But in this case Husky as a party and the city as *amicus curiae* contend that no

---

**11.** Rule 19(a), W.R.C.P. provides in pertinent part:

"(a) *Persons to Be Joined if Feasible.* A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. * * * "

change of use—at least a change of use that will adversely affect legal rights of other water users from Crow Creek—is to be effected. It is clear to us that the city's ownership and use of the water right can be materially affected, yet without its presence as a party the state engineer would have us declare that a change of use is involved and the board of control alone has jurisdiction. The intervenors ask us to go further and declare that the change of use cannot be permitted because it will adversely affect their legal rights as appropriators from the stream. We have not been advised as to just how the administrative jurisdiction would be invoked since neither the city nor Husky is likely to make application for approval of a change of use which they do not recognize as such, but unless we make declarations that a change of use is contemplated and specifically direct application to the board of control, or declare that no legal change is contemplated and Husky's proposed retention is legal, the real issues of the case concerning the authority of the board will not be decided. In either event then, we make a decision that is of the utmost importance to the city.

The claim of the intervenors that water which has historically returned to the stream so that others may use it must continue to return thereto and that a user of water may not change or expand that use so long as junior appropriators are injured thereby, is one that finds general supporting authority. One of the contentions in the city's brief, not fully developed or explored, that water which has been brought into the watershed from a foreign source is not water in which other appropriators have any priority, represents a counter-proposal worthy of consideration. A number of questions must be answered before this litigation can be brought to a proper decision, and we would not be considered as favoring any side. All of the parties seem to find comfort in *Wyoming Hereford Ranch v. Hammond Packing Company*, 33 Wyo. 14, 236 P. 764 (1925), and it is true that there is much in that case which is pertinent to the dispute in this case. The point that we make is that any decision

which we or the district court might enter herein, without a real factual basis upon which to proceed, and in the absence of the city which has a vital and continuing interest in the decision that is made, would be a holding as a matter of fact and of law that water which has been diverted, impounded, treated and distributed (only a part of which may be considered as coming from the direct flow of Crow Creek), and during the period of such use and before it has returned to any natural stream, spring, lake or other collection of still water, is to be treated as the property of the state and subject to its control and supervision through the board of control and the state engineer. We do not say that this may not be the proper construction of our constitution, statutes and former decisions of this court, but only that the owner of the water right, and not a purchaser, lessee or licensee or other party contracting with the city only for the purchase of a limited quantity thereof, must be a party to the proceedings if a just and proper decision is to be reached.

The disposition of this case has been disrupted by the naive and wholly unwarranted assumption of the city that it may appear as *amicus curiae*, submit its views through a brief and base its claim of interest or lack of interest in the suit upon whether the decision issued in the action is favorable or unfavorable to it. That is clearly not the intention of the declaratory judgment act nor of Rule 19(a), W.R.C.P. Those persons who are affected by the action are to be parties therein.

The principles concerning indispensable parties are not easy and there are many decisions defining the term. Our own court has considered the question in two fairly recent cases. *American Beryllium & Oil Corporation v. Chase*, 425 P.2d 66 (1967), and *Oxley v. Mine and Smelter Supply Co.*, Wyo., 439 P.2d 661 (1968), in both of which the definition of an indispensable party is said to be:

" * * * one without whose presence before the court a final decree could not be made without either affecting his interest

or leaving the controversy in such a condition that its final determination might be wholly inconsistent with equity and good conscience. * * *" (Quotation from 439 P.2d at 663)

A series of four tests are set forth in these cases, a negative response in any one of which renders the absent party indispensable. These tests are (again quoting from 439 P.2d at 663):

"1. Is the interest of the absent party distinct and separable?

"2. In his absence can the court render judgment between the parties before it?

"3. Will the decree made in his absence have no injurious effect on his interests?

"4. Will the final determination in his absence be consistent with equity and good conscience?"

In the latter of these two cases it was held that the owner of mining claims was not an indispensable party to action to enforce claimed liens asserted not against the mining claims themselves or the owner's interest therein, but only against whatever interest the parties defendant in the case had. Similarly, in the earlier case no title of the absent party was involved. While the statement of the rule in these two cases is unobjectionable, we do not think that application of the tests therein approved to the facts of this case can result in four affirmative answers. The claim is here advanced that Husky may not change or expand the use of the water right in derogation of the rights of downstream appropriators. The interests which Husky seeks to assert are inextricably tied into the ownership of the city of the water right and can be asserted only on the basis that the city as owner of the right could take the steps which Husky seeks to take. Perhaps the second question could be answered in the

affirmative and the court could say that a judgment could be rendered as between Husky, the intervenors and the state engineer, but such a decision cannot cope with the real problem which deals with the water right itself and possible but stringent restrictions having to do with return of the water to the stream. Husky is not the alter-ego of the city nor is it the owner. Their interests insofar as this suit is concerned may be quite identical, but that clearly brings the case within the first test and their interests are not distinct and separable. No decision may be entered as to Husky which will not affect (at least as a matter of stare decisis) the decision that might be entered at such time as the city might see fit actively to protect its interest. In this situation the language in *Metropolitan Denver Sewage v. Farmers Reservoir and Irrigation Company*, 179 Colo. 36, 499 P.2d 1190, 1192 (1972) is most pertinent:

"In our view, the possession of the sewage in effluent by Metro is in the nature of possession by an agent, an agent for Denver. While no doubt Metro is an indispensable party here, the real party in interest is Denver. Whatever disposition Denver may make of the effluent, Metro can make; and whatever disposition Denver cannot make is proscribed to Metro."

We think that the lack of an indispensable party is of such importance that we may properly raise the question on our own motion. Under Rule 12(h)(2), W.R.C.P. the defense of lack of indispensable party may be made at the trial on the merits and under Rule 12(h)(3) if it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. There are expressions of the courts that lack of an indispensable party results in lack of jurisdiction although this view has been criticized.[12] In one of the earliest and

12. See Wright & Miller, Federal Practice and Procedure: Civil §§ 1610 and 1611. At page 115 it is said:

"Because an objection to the failure to join a person who should be regarded as indispensable under Rule 19(b) may be raised as late as on an appeal from a final judgment or by

the court on its own motion, the impression is created that a failure to join is jurisdictional, for ordinarily only jurisdictional defects are treated in this fashion. Thus, it is not surprising that many cases can be found that speak of non-joinder as ousting the court of jurisdiction."

most cited cases on the question of indispensable parties, *Shields v. Barrow*, 17 How. 130, 58 U.S. 130, 15 L.Ed. 158, 161 (1854). it is said:

" \* \* \* [A]s is observed by this court, in *Mallow v. Hinde*, 12 Wh., [193] 198, [25 U.S. 193, 6 L.Ed. 599] when speaking of a case where indispensable parties were not before the court, 'we do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever may be their structure as to jurisdiction; we put it on the ground that no court can adjudicate directly upon a person's right, without the party being either actually or constructively before the court.' "

The position we take may be inconsistent with that taken by this court in *Wyoming Hereford Ranch v. Packing Company*, 31 Wyo. 31, 222 P. 1027 (1923), discussing the question but reserving ruling on motion to dismiss the appeal because of the absence of the city until after consideration on the merits, and *Wyoming Hereford Ranch v. Hammond Packing Company*, supra, specifically holding that the city was not a necessary party to the appeal. The city had been a party to the action and had appeared therein, in the course of which a judgment was entered that a contract for the sale of certain water from the city to Hammond was invalid. The city did not appeal and in its final opinion concerning its necessity as a party in the appeal, this court said, 33 Wyo. at 44, 236 P. at 773:

" \* \* \* From what was said in that opinion on the motion, and in this opinion on the merits, we think it appears that the only question in issue with respect to the discharged sewage waters was a question between the plaintiff and the defendant packing company; the former contending that such waters became a part of the public waters subject to appropriation under the laws of the state, and the latter contending that it had a right to said waters by grant from the city. That question could have been determined without bringing the city into the case. The city, therefore, was not a

necessary party, and the motion to dismiss will be denied."

However, there is implicit throughout that case an element of lack of interest of the city. The waters had served their purpose insofar as the city was concerned and the court was careful to point out that the city had filed what amounted to a disclaimer in the action, the judgment could be taken as a dismissal of the city, and it appeared to be satisfied with the judgment and had not sought to be a party to the appeal. In the present case the city has actively, although as yet only through briefs as *amicus curiae*, asserted its material interest in the outcome of the action and has indicated its strong support of a position contrary to that of the state authorities and the intervenors.

While not directly in point, the disposition by this court of *Mountain West Farm Bureau Mutual Insurance Company, Inc. v. Hallmark Insurance Company*, Wyo., 561 P.2d 706 (1977) is pertinent. We there denied jurisdiction of a suit to determine the respective liabilities of two insurance companies to their respective insureds when the plaintiff failed to place in evidence its own insurance policy, and rejected jurisdiction of another part of the action seeking construction of a "hold-harmless" agreement between the two insureds, not parties to the action. This is a rejection of any view that the court should consider rights between parties to the suit which can really not be settled without the presence of nonparties.

In 3A Moore's Federal Practice, 2d Ed., ¶ 19.05, after pointing out the importance of the principle in the federal practice, the author proceeds (pp. 2209–2210):

"But the concept of indispensability goes beyond federal jurisdiction and touches the very power or the right of the court to make an equitable adjudication, where an indispensable party is not before it. In this situation, barring exceptional equities, it should not proceed without his joinder, \* \* \*."

After pointing out that Rule 12(h) permits the defense to be raised at the trial, the author continues (p. 2211):

" * * * And the matter is so vital that an appellate court, *sua sponte* if necessary, may consider it although the point was not raised in the trial court. If the indispensable party can be joined, the court should ordinarily permit the joinder and not dismiss the action."

Before closing, we would note that the dissent as expressed by Mr. Justice Raper, while arguing that the state board of control cannot be a party to the action, nevertheless concedes that the issues as originally posed by Husky have been considerably expanded by the answer in behalf of the state engineer and DEQ. As he points out, the answer, which for practical purposes could be treated as a counterclaim, specifically asserts the jurisdiction and authority of the board of control over Husky's proposed actions. To us, this emphasizes the board's vital interest in the outcome of the suit. Since the action is one for declaratory judgment and the court should make all declarations that will end the controversy, it does not seem important to us whether the questions are raised by answer or counterclaim, but the concept that the board's interests can adequately and properly be represented by another party seems to us as novel and unacceptable as the proposition that the city's interests are adequately and properly represented by Husky. We further note that in raising questions concerning the position of the board and the city in this declaratory judgment action the majority have not sought to give definitive answers and have not tried to foreclose the right of any of the parties, nonparties or the intervening downstream water users to secure binding and legal determinations of the many issues that appear to be involved. The far-reaching scope of the dissent of Mr. Justice Raper, as also that of the Chief Justice, and the answers they would give to those questions only confirm our view of the essential and inseparable connection of the city and the board of control with the questions raised. We do not say that those questions should not be answered; we only say that in good conscience and equity they should not be answered without the presence of parties that are vitally affected by those answers.

There is no reason why the city cannot easily be joined as a party nor do we see any reason why the board of control, or the members thereof, may not similarly be joined. The cause is remanded to the district court with directions to bring in the board of control or its members and the city of Cheyenne as parties, then proceed to develop the facts concerning the city's appropriations, the use made thereof, and the proposed treatment of water by Husky through impoundment. It should certainly be determined whether, as alleged by Husky, this is to be part of a recycling process or, as seems to be contended by the state authorities and the intervenor, will result in complete evaporation of the water not now consumptively used in the refining process. On that factual basis, then, the court can enter its declarations whether a change of use is contemplated, whether the rights of intervenors are or may be affected, and what legal authority and jurisdiction the board of control has in the premises.

Reversed and remanded with instructions.

RAPER, Justice, dissenting.

I join in the dissent of the Chief Justice and separately dissent, as well.

It appears to me that the majority has gone to extreme lengths to justify the remand of this case to the district court to join additional parties and carry on a full-blown trial to develop facts that are not in dispute or important at this juncture with parties either before the court or in my view unnecessary in this proceeding.

There is only one simple issue to be decided, and that was presented by the Husky Oil Company in its action for a declaratory judgment. Boiled down, it and the State are only asking the court: "Must Husky make application to the State of Wyoming for a permit to impound waters under the facts presented?"

I have no end of trouble trying to find, let alone determine upon what authority

the majority arrive at their conclusion that the board of control is a necessary party. I find no legislative permission[1] for that agency to sue or be sued in any type of case. It must be pointed out that the title of the case before us is "*Husky Oil Company, Plaintiff, v. The State of Wyoming, by and through George Christopulos, State Engineer of the State of Wyoming, and Robert Sundin, Director of the Department of Environmental Quality, Defendants.*"

There is in particular no authority to sue individual state officers and boards or even the State under the Uniform Declaratory Judgments Act. It was held in *Retail Clerks Local 187 AFL–CIO v. University of Wyoming*, Wyo.1975, 531 P.2d 884, that there is no legislative consent to sue the State to be found in the Declaratory Judgments Act. In *Hjorth Royalty Company v. Trustees of University of Wyoming*, 1924, 30 Wyo. 309, 222 P. 9, this court declared that a suit against an officer or board of the state is an action against the state, which rule was confirmed in *Retail Clerks.*

This court likewise in *Retail Clerks* spoke with approval from *Ex parte: In the Matter of State of New York*, 256 U.S. 490, 500, 41 S.Ct. 588, 590, 65 L.Ed. 1057, that determining who are parties to a suit is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record.

The State of Wyoming answered through the attorney general of Wyoming in the name of the State of Wyoming. He and his assistants are the only counsel authorized to represent the State, its officers and agencies. Section 9–125, W.S.1957, provides in pertinent part:

"The attorney general shall prosecute and defend all suits that may be instituted by or against the State of Wyoming, the prosecution and defense of which is not otherwise provided for by law, and he shall represent the state in all criminal cases in the supreme court, and shall defend all suits brought against the state officers in their official relations, except suits brought against them by the state. He shall be required to attend to the interests of the state in all suits, actions or claims in which the state is or may become interested in either the supreme court of the state, or in any of the United States courts. * * * "[2]

While the State probably could have raised the defense of immunity, it elected instead to remain in court and assume the role of aggressor. It has never been questioned that the State cannot enforce its laws in the courts of this state. This court held in *Zweifel v. State ex rel. Brimmer*, Wyo.1974, 517 P.2d 493, that § 9–132, W.S. 1957,[3] authorizes the attorney general to go into any court in the state to prosecute any proceeding which is in his opinion in the best interest of the State.

The State of Wyoming, then, in responding to the plaintiff's complaint, prayed as follows:

priate relief against the violation and to enforce the act or a permit issued hereunder, and upon a proper showing a permanent or preliminary injunction or temporary restraining order shall be granted without bond."
I find no authority to sue the department or any of its officers in any sort of action.

1. Before a suit may be brought against the State, § 8, Article I, Wyoming Constitution, requires that the state legislature must direct the manner in which it must be done.

2. While no question is raised by the majority opinion with respect to the Department of Environmental Quality, also named, Section 35–502.92, W.S.1957, 1975 Cum.Supp., imposes specific duties on the attorney general:

"(d) In addition to any penalty provided in subsections (b) or (c) of this section, whenever the office determines that a person is violating any of the provisions of this section, it shall refer the matter to the attorney general who may bring a civil action on behalf of the state in the district court in and for the county of Laramie for injunctive or other appro-

3. Section 9–132, W.S.1957, in pertinent part, is as follows:

" * * * The attorney general, his deputy or any of his assistants are hereby authorized to go into any of the courts of the State of Wyoming or the United States and prosecute or defend on behalf of the state whenever in the opinion of the attorney general the interest of the state would be best served by so doing."

"1. That the Court determine and declare that Plaintiff's plan to impound effluent waters which have historically been returned to Crow Creek is a change and expansion of use and the storage of a direct flow water right which is within the jurisdiction of the *State Engineer* and *State Board of Control*;

"2. That the Court determine and declare that the *State Engineer* and *State Board of Control* have primary jurisdiction of Plaintiff's proposed impoundment and that the Court shall refrain from assuming jurisdiction of this action until the Plaintiff exhausts its administrative remedies;

"3. That the Court determine and declare that the Plaintiff's failure to treat its effluent waters and continue its return flows to Crow Creek would be injurious to downstream appropriators and would violate Wyoming law;

"4. That the Court order Plaintiff to meet the requirements of its discharge permit by some means other than total impoundment and continue its return flows into Crow Creek for the use of downstream appropriators." (Emphasis added.)

Paragraph 2 raises the only issue with which we should concern ourselves. The briefs indicate that to be the primary issue. The other paragraphs are shotgun approaches.

The whole matter was heard by the district court on the pleadings and various affidavits under motions for summary judgments filed by both Husky and the State of Wyoming. While the answer of the State was not denominated a counterclaim, it certainly can be, and I would construe it as such. Rule 8(c), W.R.C.P., provides in part that

" * * * When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."

Obviously, the whole attitude of the State in the proceeding articulates its insistence that Husky apply for a permit to impound water, before it proceeds with its plan to construct an evaporation basin. I would hold that the state board of control cannot be a party to the action and whatever interest it may have is only as a satellite of the State and its interests are present and represented in the proceeding, without designation as a party.

Before I can adequately discuss the absence of any requirement that the City of Cheyenne be joined and explain why it is not a necessary party, the factual situation should be further set out. The majority do not explain sufficiently how this case arose. While I have no dispute with the facts in the majority opinion as far as they go, I wish to enlarge and express them in my own way, and in connection therewith explain the applicable law.

For almost 30 years Husky has purchased, and still purchases, large quantities of treated water from the City of Cheyenne's municipal water system for use in its Cheyenne refinery. During a typical period from July, 1975, to February, 1976, Husky purchased a monthly average of 49,062,000 gallons of water, consumed approximately two-thirds of this total in its refinery process, and discharged the remainder, 16,338,750 gallons (50,142 acre-feet) per month into the channel of Crow Creek. This monthly discharge was and is used by downstream appropriators with priority dates ranging from March, 1888, to June 18, 1970.

As required by the Wyoming Environmental Quality Act, Husky requested and was issued a water discharge permit by the Wyoming Department of Environmental Quality. The permit allowed for the discharge of certain pollutants until July 1, 1977, after which time Husky was required by its terms to conform to more stringent pollutant standards, as adopted by the Wyoming Department of Environmental Quality from federal pollution standards. See § 35–502.19, W.S.1957, 1975 Cum.Supp. and §§ 4(a)(1) and 9, Chapter II, Wyoming Water Quality Rules and Regulations. In order to comply with such pollution-control

requirements, Husky agreed with the Department of Environmental Quality to construct facilities to transport, store, impound, reuse, recycle and otherwise utilize its refinery effluent without direct discharge into Crow Creek. The foregoing transaction took place between Husky and personnel of the State Department of Environmental Quality without any consultation with, knowledge of or reference to the state engineer.[4] Section 35–502.9(a)(ii) requires consultation and cooperation between the Director of the Department of Environmental Quality and other agencies of the State. We were informed during oral argument that this lack of communication in water quality matters has since been corrected.

It is undisputed that the Department of Environmental Quality, in administering the Environmental Quality Act, did not and does not require Husky to adopt a system of total impoundment. What there appears to be here is a simple case of failure of a state agency and a water user, at the time the impoundment was approved, to even think about or consider the interests of others who might be affected. In response to the state engineer's assertion of permit jurisdiction over this project, Husky initiated in the district court an action praying for declaratory relief that the state engineer had no jurisdiction to require a permit for the proposed refinery waste impoundment, and in the alternative, that § 35–502.18, W.S.1957, 1975 Cum.Supp.,[5] of the Wyoming Environmental Quality Act was unconstitutional. Intervenors, as downstream surface and groundwater appropriators, alleging injury if the impoundment reservoir is constructed, were then permitted to intervene. Following delineation of the issues by pleadings, Husky and the State of Wyoming moved for summary judgment. In granting Husky's motion, the district court concluded that the state engineer did not have the jurisdiction asserted and that downstream appropriators had no claim. No ruling was made on the constitutionality of § 35–502.18, the question not having been raised nor argued at the summary judgment hearing. This appeal immediately followed.

The basic question presented concerns whether or not the state board of control, and thereby the state engineer, has any permit jurisdiction over Husky's proposed impoundment of its refinery effluent. As noted by all parties presenting briefs—the State, Husky and amicus curiae, City of Cheyenne—a finding of permit jurisdiction for the state engineer and board of control must be predicated upon constitutional grounds, implemented by statutory authority, most logically either the storage-facility permit statute, § 41–29.1, W.S.1957, 1975 Cum.Supp.,[6] or the change-in-use statute,

---

**4.** The board of control has "supervision of the waters of the State and of their appropriation, distribution and diversion." Section 2, Article VIII, Wyoming Constitution. The state engineer has "general supervision of the waters of the state." Section 5, Article VIII, Wyoming Constitution.

**5.** Section 35–502.18 provides:

"(a) No person, except when authorized by a permit issued pursuant to the provisions of this act [§§ 35–502.1 to 35–502.56], shall:

"(i) Cause, threaten or allow the discharge of any pollution or wastes into the waters of the state;

"(ii) Alter the physical, chemical, radiological, biological or bacteriological properties of any waters of the state;

"(iii) Construct, install, modify or operate any sewerage system, treatment works, disposal system or other facility, capable of causing or contributing to pollution;

"(iv) Increase the quantity or strength of any discharge;

"(v) Construct, install, modify or operate any public water supply."

**6.** Section 41–29.1 provides:

"The holder or owner of an adjudicated water right to the direct use of the natural unstored flow of any surface stream of the state may store such direct flow so long as no other Wyoming appropriator or user is injured or affected thereby. Prior to the commencement of the storage of water under a direct flow water right, the appropriator shall submit a request for such storage in writing to the state engineer and shall obtain the approval of the state board of control. The state board of control may permit storage at any time so long as there is no interference with existing water rights or uses. The state engineer is authorized and empowered to prescribe such rules and regulations as may be necessary or desirable to enable

§ 41–4.1, W.S.1957, 1975 Cum.Supp.[7] Of these two statutes, I believe the change-in-use, hereinafter referred to as "change" statute, provides the better basis. The storage-facility statute, by its provisions, deals only with storage of direct flow water rights, a situation somewhat different from the one at bar, though some direct flow water is involved. The water here has its source from wells and a pipeline from another watershed, mingled in reservoirs west of the City of Cheyenne, thereafter treated and distributed through the City's system and ultimately acquired under contract by Husky. Husky has elected impoundment of polluted water issuing from its industrial facility, rather than a cleaning-up process and discharge back into the creek. There is no direct flow storage, except very indirectly.

By constitutional charge, all natural waters within the boundaries of Wyoming are considered to be the property of the State. Section 1, Article VIII, Wyoming Constitution. Yet, this ownership by the State has been found subject to a specific trust, well summarized from Wyoming precedent in *Mitchell Irr. Dist. v. Sharp*, 10 Cir. 1941, 121 F.2d 964, 967, cert. den. *Sharp v. Mitchell*, 314 U.S. 667, 62 S.Ct. 129, 86 L.Ed. 534:

"The title to water in the natural streams in Wyoming is in the state but the water is subject to withdrawal for application to irrigation or other beneficial use. In other words, the water is owned by the state subject to appropriation for beneficial use. It has been said that the ownership of the state is subject to a particular trust—the trust being the right of appropriation for beneficial use. *Willey v. Decker*, 11 Wyo. 496, 73 P. 210, 100 Am. St.Rep. 939. * * * The state owns title to the water running in the stream, except as it may from time to time be lawfully diverted for application to authorized beneficial use, while the right of the appropriator attaches not to the water while running in the natural channel but to the use of a limited quantity thereof for beneficial use, *in pursuance of an appropriation perfected and continued in compliance with the requirements of law. Farm Investment Co. v. Carpenter*, 9 Wyo. 110, 61 P. 258, 50 L.R.A. 747, 87 Am.St.Rep. 918." (Emphasis added.)

See also *Lake De Smet Reservoir Company v. Kaufmann*, 1956, 75 Wyo. 87, 292 P.2d 482, where it was wisely said in dealing with water, we cannot ignore the public interest and the relative rights to beneficial use in a regulated manner.[8]

---

him to effectively administer the provisions of this section."

7. Section 41–4.1 provides:
"(a) When an owner of a water right wishes to change a water right from its present use to another use, or from the place of use under the existing right to a new place of use, he shall file a petition requesting permission to make such a change. The petition shall set forth all pertinent facts about the existing use and the proposed change in use, or, where a change in place of use is requested, all pertinent information about the existing place of use and the proposed place of use. The board may require that an advertised public hearing or hearings be held at the petitioner's expense. The petitioner shall provide a transcript of the public hearing to the board. The change in use, or change in place of use, may be allowed, provided that the quantity of water transferred by the granting of the petition shall not exceed the amount of water historically diverted under the existing use, nor exceed the historic rate of diversion under the existing use, nor increase the historic amount consumptively used under the existing use, nor decrease the historic amount of return flow, nor in any manner injure other existing lawful appropriators. The board of control shall consider all facts it believes pertinent to the transfer which may include the following:
"(i) The economic loss to the community and the state if the use from which the right is transferred is discontinued;
"(ii) The extent to which such economic loss will be offset by the new use;
"(iii) Whether other sources of water are available for the new use.
"(b) In all cases where the matter of compensation is in dispute, the question of compensation shall be submitted to the proper district court for determination."

8. An interesting discussion of relative and reasonable beneficial uses of water appears in "The Concept of Recoverable Beneficial Use in the Law of Surface Streams", Trelease, 12 Wyoming L.J. 1. The author observed a developing rule that a particular use must not only be in an accepted class of beneficial uses but it

The concept of beneficial use may thus be characterized as the ultimate foundation and measure of every water right held under the priority appropriation system prevailing in this and other arid states. *Budd v. Bishop*, Wyo.1975, 543 P.2d 368, 373; *Lincoln Land Co. v. Davis*, U.S.D.C.Wyo.1939, 27 F.Supp. 1006, 1008; *McNaughton v. Eaton*, 1952, 121 Utah 394, 242 P.2d 570. In Wyoming, its application and supervision, by constitutional provision, is entrusted to the board of control and the state engineer. Sections 2 and 5, Article VIII, Wyoming Constitution.

However, water is a valuable resource of this state and when beneficial uses are in conflict, one must bow to the other. A significant Wyoming constitutional provision, separate from Article VIII, bears on that subject. Section 31, Article I:

"Water being essential to industrial prosperity, of limited amount, and easy of diversion from its natural channels, its control must be in the state, which, in providing for its use, shall equally guard all the various interests involved."

In the case before the court are the interests of Husky's industry, the agricultural interests downstream and environmental considerations, all of which have been and are of legislative concern and ours. We must draw a balance in use of this valuable resource. As pointed up in *Bower v. Big Horn Canal Association*, 1957, 77 Wyo. 80, 307 P.2d 593, 599–600, water must be subjected to the largest practicable use and beneficial uses and the prevention of wastage are major factors in determining who shall have the right to utilize water. Bower only held that as long as there was waste water, it could be put to use by a junior appropriator but the junior appropriator could not compel the continuance of waste, where the waste could be put to beneficial use through improved irrigation methods by the senior appropriator.

I am not contemplating the type of water waste considered in *Binning v. Miller*, 1940, 55 Wyo. 451, 102 P.2d 54, where seepage

water of a prior appropriator was captured; the court there only held that a person could not appropriate a permanent right to such seepage because of the possibility that a better way of utilization, without waste and seepage, could occur and one cannot compel another to continue waste.

Husky is not proposing a better way to utilize the water by recycling but plans to run it into a basin for evaporation, which will serve no industrial use in the actual refining process. It only represents one way of satisfying environmental requirements for eliminating the discharge of polluted effluents, resulting from refinery procedures. The key fact in the disposition of the problem before us is that evaporation is not the only solution, as pointed out by unresisted affidavit. We do not have the details of how the water may be otherwise rescued but that is a matter for the technical skill of others. It is the presently existing fact, giving the state engineer and state board of control, jurisdiction, under their supervisory powers, because the water, after industrial use, would normally be restored to the control of the State, as it historically has been.

It is basic in this state that an appropriator cannot acquire a right that permits him to use more water than is reasonably necessary for beneficial purposes. *Quinn v. John Whitaker Ranch Co.*, 1939, 54 Wyo. 367, 92 P.2d 568; *Farm Investment Company v. Carpenter*, 1900, 9 Wyo. 110, 61 P. 258, 50 L.R.A. 747, 87 Am.St.Rep. 918. The problem of the case before the court arose over a half-century ago in *Pulaski Irr. Ditch Co. v. City of Trinidad*, 1922, 70 Colo. 565, 203 P. 681, where Trinidad undertook to purify its sewage. The issue was whether the City could sell the water left after purification, for agricultural purposes, or whether that remainder must go downstream to prior appropriators, who had been using left-over water from a previous system of sewage disposal. An argument was made, in favor of selling, that once the City took possession, it had a right to destroy the water and

must also be reasonable and economic in the light of either present and future demands on

the source of supply. See in particular pp. 6–7, 16–17 and 19–21.

might have disposed of its sewage by evaporating it away.[9] The court decided that the right to destroy water by evaporation can only exist when there is no other practical method of sewage disposal. The court held that the water did not belong to the City to sell, under the circumstances there.

As was said in *Wyoming Hereford Ranch v. Hammond Packing Co.*, 1925, 33 Wyo. 14, 236 P. 764:

> " * * * when waters have been used to the full extent intended by the appropriation, the quantity unconsumed and returned to the stream is then a part of the waters of the state."

The court made it clear that nothing in Wyoming precedent[10] should be taken "as establishing any principle that would authorize the city [Cheyenne] to control the rights of subsequent appropriators from a stream [Crow Creek] to which the city returns waters that have served the purpose of the appropriation by the city." The court then went on to explain that once the City's right to the beneficial use has been enjoyed and the water returned to the stream, it is subject to beneficial use by other appropriators, under state control.

One manner in which the state engineer and the state board of control fulfill their supervisory duty and control over beneficial use in the appropriation system is to require permit approval before the use of validly acquired water rights can be changed. Section 41–4.1. This required approval insures not only that the use will remain beneficial after the proposed change, but also that the proposed change itself will not adversely affect other valid appropriators from the same water source. The problem that arises is that although the statute designates specific factors to be considered, as, for instance, historic diversion, historic consumptive use, historic return flows, § 41–4.1(a), it does not designate what specific manner of change is to be covered. Never-

theless, in light of the clear, dual purposes of the statute, one, to protect from injury the vested rights of other valid appropriators and, two, supervision of continued beneficial use, it should be readily apparent that any change of whatever character, which brings into question either of these two areas, should be covered.

In the litigation now before the court, the asserted change in question can be likened more to an enlargement of use rather than the traditionally accepted notion of change from one specific use to another. In any event, the water right use as changed in that respect, will be evaporated for pollution control, a new—"another use". Yet, even such enlargements of use have been recognized as changes sufficient to bring under scrutiny the question of beneficial use as well as the rights of other appropriators. It was explained in *East Bench Irr. Co. v. Deseret Irr. Co.*, 1954, 2 Utah 2d 170, 271 P.2d 449, 455, that:

> " * * * Such a change would *enlarge* the rights of the upper appropriators and impair the vested rights of the lower users because their rights were established on the basis that *no such enlargement or changes of use* would be made after the lower users had perfected their appropriation, and this is true of storage as well as direct flow waters." (Emphasis added.)

Then, in *City of Westminster v. Church*, 1968, 167 Colo. 1, 445 P.2d 52, 55:

> " * * * Where an owner of decreed rights, after obtaining a decree permitting a change in point of diversion, *enlarges or attempts to enlarge the use of his water rights to the injury of other appropriators*, the permissive decree does not bar relief to the latter. *Dry Creek No. 2 Ditch Co. v. Coal Ridge Ditch Co.*, 109 Colo. 556, 129 P.2d 292; *New Cache La Poudre Irrigating Co. v. Water Supply*

---

9. For an informative law review article dealing for pollution abatement with the problem created when water is evaporated, see XII Land and Water L.R. 431, "Water Law—Cessation of Return Flow as a Means of Complying with Pollution Control Laws" by Robert G. Berger.

10. *Edwards v. City of Cheyenne*, 1911, 19 Wyo. 110, 114 P. 677, reh. den. 122 P. 900; *Holt v. City of Cheyenne*, 1913, 22 Wyo. 212, 137 P. 876.

*& Storage Co.*, 74 Colo. 1, 218 P. 739." (Emphasis added.)

The facts before the court in that respect have raised a new question, so in citing and quoting from the above cases, I do so only for the purpose of setting out principles. Those cases, I realize, do not present the interplay between environmental demands upon and beneficial use of water nor do they present the question of substantial water waste by one not an appropriator but as an industry having a preferred water right. Again, there is a question for the board of control, not at this time a question to be decided by the courts.

What is a water right? That is an important consideration in this case because § 41–4.1 (set out in full in footnote 7 of this dissent), which I would hold requires Husky to file an application for a change of use with the state engineer for consideration by the state board of control, provides in part that *"[W]hen an owner of a water right* wishes to change a water right from its present use to another use, * * * he shall file a petition requesting permission to make such a change. * * * "

A "water right" is defined by § 41–2, W.S.1957, as follows:

*"A water right is a right to use the water of the state,* when such use has been acquired by the beneficial application of water under the laws of the state relating thereto, and in conformity with, the rules and regulations dependent thereon. Beneficial use shall be the basis, the measure and limit of the right to use water at all times, not exceeding the statutory limit except as provided by section 122–117 Revised Statutes of Wyoming, 1931, as amended by chapter 105, section 1, Session Laws of Wyoming, 1935 [§ 41–181]. Water being always the property of the state, rights to its use shall attach to the land for irrigation, or to such other purposes or object for which acquired in accordance with the beneficial use made for which the right receives public recognition, under the law and the administration provided thereby. Water rights for the direct use of the natural unstored flow of any stream cannot be detached from the lands, place or purpose for which they are acquired, except as provided in sections 122–402 [§ 41–3] and 122–403 [§ 41–4], Revised Statutes of Wyoming, 1931, pertaining to a change to preferred use, and except as provided in section 1 of this act [§ 41–213]." (Emphasis added.)

It should be noted that not once in that section is the word "appropriation" used.

Husky has a water right by reason of § 41–3, as follows:

*"Water rights are hereby defined as follows, according to use:* Preferred uses shall include rights for domestic and transportation purposes, steam power plants, and industrial purposes; existing rights not preferred, may be condemned to supply water for such preferred uses in accordance with the provisions of the law relating to condemnation of property for public and semi-public purposes except as hereinafter provided. Preferred water uses shall have preference rights in the following order: First—Water for drinking purposes for both man and beast; Second—Water for municipal purposes; Third—Water for the use of steam engines and for general railway use, water for culinary, laundry, bathing, refrigerating (including the manufacture of ice), for steam and hot water heating plants, and steam power plants; and *Fourth—Industrial purposes.* The use of water for irrigation shall be superior and preferred to any use where water turbines or impulse water wheels are installed for power purposes; provided, however, that the preferred use of steam power plants and industrial purposes herein granted shall not be construed to give the right of condemnation." (Emphasis added.)

Again, please note that the words "appropriation" or "appropriator" are not once mentioned. Husky, by acquisition of water through the City, therefore, is satisfying its "water right" for industrial purposes, subject to the administrative requirement that a permit be obtained for impoundment under the provisions of § 41–4.1. The latter

section fits like the proverbial glove. The City only has an appropriation; Husky has the water right.

An "appropriation" of water and a water right are not necessarily synonymous. This court has held that the act of appropriation may be undertaken by someone other than the person who possesses the water and puts it to beneficial use. In *Scherck v. Nichols*, 1939, 55 Wyo. 4, 95 P.2d 74, the court was interpreting what is now § 41–201, W.S.1957, setting out the procedure for applying for a permit to make an appropriation. This court there held that the applicant for an appropriation need not be the user, the only requirement being that the water be put to beneficial use and not diverted to "idle purposes". The court spoke approvingly of Colorado precedent in which the applicant for a permit for a water right was only an intermediate agent for the ultimate user of the water. I am satisfied that this court in *Scherck* dispels any concept that there is any magic in the City being the nominal appropriator of water for the use of others. *Scherck* pointed out that the statutes of this state place the main stress on the "beneficial use" of water. *Scherck* compared the acquisition of a water right by one for the benefit of another to contract with one for the benefit of another not a party to the contract.

It can further be said with respect to the role of the City as an appropriator that its water right is by § 41–3, limited to "municipal purposes." I visualize those to be by way of example, not exclusively: fire protection, street and sewer flushing, a supply of water for use in its public buildings, etc. It is a matter of convenience that it provides an appropriation of water and distribution system to satisfy the individual water rights of others; drinking for "man and beast"; "culinary" and "bathing" for householders and; "industrial" for those business concerns not having a source except through the City's system. These views are not original with me. This court said in *Johnston v. Little Horse Creek Irrigating Co.*, 1904, 13 Wyo. 208, 233, 79 P. 22, 26, 70 L.R.A. 341, 110 Am.St.Rep. 986:

"* * * The appropriator secured a property right. A portion of that right it sold to be beneficially applied to other lands. It sold, not water, but the right to use water; in other words, a water right."

The City, as a distributor of water, is a public utility, § 37–1(e) providing, amongst other categories, designated "public utilities," "Any plant, property or facility for the supply, storage, distribution or furnishing to or for the public of water for manufacturing, municipal, agriculture or domestic uses;". The municipality, acting as a utility, is authorized by the legislature to contract for the furnishing of water for industrial use by § 15.1–470, W.S.1957, C.1965, which provides:

"Any city or town may contract to furnish water at and adjacent to the city or town for a term of years as agreed upon, to any railroad company for use in its shops, locomotives, and other railroad purposes, and to any subsidiary or affiliate of any such railroad company whose principal business at or adjacent to the city or town is the furnishing of material or service, or both, to the railroad company, *and to any industrial user of water whose principal needs for water, at or adjacent to the city or town, are defined as preferred uses or [of] water after the industry or industries has established its own priority.*" (Emphasis added.)

That statutory section cinches any question that Husky's water right is a municipal water right. Husky must establish its own priority for industrial use, separate and apart from that of the City. I conclude ever so clearly that Husky has a direct obligation to the board of control with respect to its water right.

What Husky proposes here is an expansion of water utilization from its historical use under its industrial priority in the refining process alone to something more, to not only use in the refining process but to use in large-scale pollution abatement, as well. Tied up with this proposed-use-enlargement are innumerable possibilities which could affect not only such conditions as historic

consumption and historic return flows but also the vested rights of junior appropriators to a continuation of historic stream conditions. It is well established that junior appropriators have vested rights in a continuation of stream conditions existing at the time of their appropriations and they may successfully resist proposed changes in points of diversion and use which in any way materially affect their rights. *Farmers Highline Canal & Reservoir Co. v. City of Golden*, 1954, 129 Colo. 575, 272 P.2d 629.[11] That case also stands for the principle there expressed that a prior appropriator has no right as against a junior appropriator to use waste water.[12]

Actual physical possession of water does not give its appropriator nor its user, having a water right, the absolute, unqualified right to dispose of the water as he pleases. The use made must at all times fall within the outline of the shadow of beneficial use, for that is its limit as well as foundation. *Budd v. Bishop*, supra; *Mitchell v. Sharp*, supra; § 41–2, W.S.1957. Water appropriators and users do not live in a vacuum; their actions must be considered in light of the possible, foreseeable effects on other appropriators and those having water rights. Whether or not the change to "another use"—enlargement of use—proposed herein, falls within the shadow of beneficial use, as outlined by the numerous possible effects involved, is a decision the board of control has been mandated by the Wyoming Constitution and statute to make. Section 2, Article VIII, Wyoming Constitution; § 41–4.1, supra.

It is my view and I would hold that Husky must obtain two permits, one from the state board of control and the other from the Department of Environmental Quality. By legislative enactment, precious water must not only be fairly allocated and beneficially used but also must meet quality standards. The two concerned agencies of the State cannot each go its own way. The state engineer, in issuing a permit, must consider water quality. The Department of Environmental Quality must consider beneficial use and interests of downstream appropriators. I make no attempt to prescribe the mechanics of how those two important agencies of the state will carry out their mutual problems. Changes in their procedural regulations or even legislative changes may be required but it is not the function of a court to carry out those executive and legislative jobs.

In summary then, and in order that there be no misunderstanding, I would only hold that the state engineer and board of control have jurisdiction and that Husky, as one claiming an industrial water right, must apply for a permit, for consideration by the board of control. I would not hold that a permit must be granted nor, if issued, what its conditions must be. I have outlined the law only to bracket the only question and to point out that the undisputed facts and circumstances of this case compel activation of the supervisory powers of the board of control and the state engineer over the waters of the state before the water involved may be impounded. The situation herein has been created by historical actions and reliance, and a holding which did not consider such undisputed background would be judicially shortsighted. The backdrop of both facts and law, however, only serves the purpose of charting a course that requires acquisition of a permit by Husky from the board of control.

With those considerations in mind, I now move to the reasons why I dissent from the position taken by the majority that the case must be remanded to the district court for joinder of the City of Cheyenne and a full trial of the many issues the majority thinks the trial judge must consider. I consider it judicial wheel-spinning, without progress.

This court has specifically held, in a comparable case involving the City of Chey-

---

11. See also *City of Grand Junction v. Kannah Creek Water Users Association*, Colo.1976, 557 P.2d 1173; *City of Boulder v. Boulder and Left Hand Ditch Company*, Colo.1976, 557 P.2d 1182.

12. Citing *Enlarged Southside Irr. Ditch Co. v. John's Flood Ditch Co.*, 1947, 116 Colo. 580, 585, 183 P.2d 552, 554.

enne, that the City is not a necessary party to the ultimate disposition of waters that have served their municipal purpose. In · *Wyoming Hereford Ranch v. Hammond Packing Co.*, supra, it was contended that this court should not entertain an appeal because the City of Cheyenne had not been joined. The dispute in that case was between Wyoming Hereford Ranch, as a user of waters on Crow Creek, and Hammond Packing Company, which had entered into a contract with the City of Cheyenne to buy discharge sewage water for industrial purposes. The ranch contended that the waters became a part of the public water subject to appropriation and the packing company contended it had a right to the water from the City. This court decided that the question could be fully determined without bringing the City in as a party and a motion to dismiss on the ground that the City was a necessary party was denied. See also *Wyoming Hereford Ranch v. Hammond Packing Co.*, 1924, 30 Wyo. 31, 222 P. 1027, a different phase in the same case, where there was a motion to dismiss filed before the case was considered by this court on its merits, because the City of Cheyenne was not joined in the appeal, though it had been a party below. This court said in that case that since the City's appropriation of water for municipal purposes was in no wise affected, it did not appear to be a necessary party to the appeal. The court also noted that it was of significance that the City was not seeking to be made a party. The question was finally disposed of in the later 1925 appeal, as first here discussed.

Once the City allows under contract an industry the right to take water through the City's distribution system under the industry's own priority, it has exhausted one of the purposes of its appropriation. It has acted as far as it can. It never claimed any of the water diverted back into Crow Creek. It now has no objection to Husky evaporating any water left after its industrial use. Its appropriation is not in any wise affected. The disposal I suggest neither takes away nor gives the City anything of any sort.

The City's only interest is expressed in the opening to its amicus brief, filed in this court, where it is stated as follows:

"The City, as Amicus, is chiefly concerned that this litigation might create a precedent which would be interpretted [sic] as a [sic] compelling the City to discharge its treated affluent [sic] water into Crow Creek and that it would not be able to sell such water to prospective industrial customers. Another concern is that this litigation might take away from the City its historic prerogative of selling its municipal water to its customers without interference from the State Engineer."

Its brief tracks that of Husky and it neither suggests nor even hints of any additional claim to the water it has furnished Husky, under the latter's own water right and which is the only subject matter of this action.

Section 1-1061 of the Declaratory Judgments Act, relied upon by the majority, says no more than our Rules 19 and 20, W.R.C.P., with respect to joinder of parties and should cast no more spell over us than those rules.

Rule 19(a) is almost in the same language as § 1-1061 which, in pertinent part, is as follows:

"When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. * * "

Rule 19 provides as follows:

"A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or

otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action. "(b) When persons who are not indispensable, but who ought to be parties if complete relief is to be accorded between those already parties, have not been made parties and are subject to the jurisdiction of the court as to service of process, the court shall order them summoned to appear in the action. The court in its discretion may proceed in the action without making such persons parties, if its jurisdiction over them can be acquired only by their consent or voluntary appearance; but the judgment rendered therein does not affect the rights or liabilities of absent persons.

"(c) In any pleading in which relief is asked, the pleader shall set forth the names, if known to him, of persons who ought to be parties if complete relief is to be accorded between those already parties, but who are not joined, and shall state why they are omitted."

Rule 20 is in the following language:

"(a) All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

"(b) The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom he asserts no claim and who asserts no claim against him, and may order separate trials or make other orders to prevent delay or prejudice."

Of particular interest in Rule 20 is subparagraph (b) and I am convinced that it is applicable here. 7 Wright & Miller, Federal Practice and Procedure: Civil, § 1660, is explanatory of the Federal Rules 19 and 20, identical to those of Wyoming of the same number. It is there said:

"The general philosophy of the joinder provisions of the federal rules is to allow virtually unlimited joinder at the pleading stage but to give the district court discretion to shape the trial to the necessities of the particular case. [Footnote omitted.] *Rule 20(b) furthers this policy by giving the court authority to order separate trials or make any other order to prevent a party from being embarrassed, delayed, [Footnote omitted] prejudiced, or put to unnecessary expense by the joinder of a party against whom he asserts no claim and who asserts no claim against him* * * *."* (Emphasis added.)

There would be unnecessary delay and expense to all of the parties to this action to insist upon inclusion of the City, against whom the plaintiff makes no claim; the defendants make no claim against the City; the intervenors make no claim against the City; nor, is there any indication of any sort that the City has any claim against anyone. To, at this late date, require the addition of the City for the ultimate purpose of going through useless motions is wasteful of not only money but of legal and judicial time, as well.

To only hold that the state engineer and board of control have jurisdiction is as far as we must or need go would mean that

when application is made by Husky for a permit under the provisions of § 41–4.1, the board would give notice of the public hearing, at which the City of Cheyenne could appear, and there would be considered all facts and law it considers pertinent, to include the following:

"(i) The economic loss to the community and the state if the use from which the right is transferred is discontinued;

"(ii) The extent to which such economic loss will be offset by the new use;

"(iii) Whether other sources of water are available for the new use.

"(b) In all cases where the matter of compensation is in dispute, the question of compensation shall be submitted to the proper district court for determination."

It is an unconstitutional intrusion by this court upon the responsibility and function of the board of control to require the district court to consider any issue other than whether the board of control and the state engineer have jurisdiction. Section 2, Article VIII, Wyoming Constitution, bestows upon the board of control those initial determinations when it mandates:

"There shall be constituted a board of control, to be composed of the state engineer and superintendents of the water divisions; which shall, *under such regulations as may be prescribed by law, have the supervision of the waters of the state and of their appropriation, distribution and diversion*, and of the various officers connected therewith. Its decisions to be subject to review by the courts of the state." (Emphasis added.)

The legislature has prescribed the regulations with respect to the "diversion" of the water from a historical use and requires any determinations in that regard to be made by the board of control. Section 41–4.1. We will have plenty of time in which to involve our judicial hand when we review that board's action, if requested. Prior to that time, any determinations made are improper judicial interference and further a violation of § 1, Article II, Wyoming Constitution:

"The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

It was intended by the authors of our Constitution that the board of control settle matters such as that brought to our attention by this case. In *Farm Investment Company v. Carpenter*, 1899, 9 Wyo. 110, 61 P. 258, 50 L.R.A. 747, 87 Am.St.Rep. 918, Justice Potter, himself a member of the Constitutional Convention, quoted from the Journal and Debates of the Constitutional Convention for the State of Wyoming, p. 503, where it was said on the floor:

"When we appoint a board of control to manage this water system, that we say belongs to the state, let us give them authority to control it for the highest and best uses of the people of the state, and don't fix that control by saying that appropriation shall settle the matter. Leave it to the board of control to say what equities enter into this matter of the use of water, and let them consider every question that arises in connection with its appropriation, and then say under all the equities of the case who shall be entitled to the use of that water, and not say that the matter of prior appropriation shall settle it."

The board of control is better equipped to handle matters relating to water. *White v. Wheatland Irrigation District*, Wyo.1966, 413 P.2d 252. The board of control should be utilized to settle water matters because of its peculiar knowledge and expertise as to the technicalities involved, as well as the realities pertaining to water use. *Kearney Lake, Land and Reservoir Company v. Lake De Smet Reservoir Company*, Wyo.1970, 475 P.2d 548, supplemented 487 P.2d 324. This court has encouraged use of the board of control and mentioned, "[t]he ludicrous spectacle of learned judges solemnly decree-

ing water rights." *Louth v. Kaser*, Wyo. 1961, 364 P.2d 96.

I would reverse the district court in such a manner as to require Husky to apply for a change-of-use permit with the state engineer and board of control.

GUTHRIE, Chief Justice, dissenting.

I, too, must respectfully dissent. I join in the dissent of my brother Raper, but feel that because the appropriation, use, and control of the waters of this state comprise the single most important area of concern to all of the citizens of Wyoming, I feel compelled to set out shortly some of my views and the reasons therefor.

It is my view that the majority opinion casts confusion into this field and departs from long-established precedent, and that it fails to conceptualize or recognize the basic constitutional commandments that all the waters are the property of the state, subject alone to the supervision and control of the State Board of Control and that the only power, authority, or jurisdiction of courts in this area is one of appellate review. I am also concerned that this opinion ignores the basic principle that although the right to use of water is described as one of ownership, this is conditional and such use is always subject to the doctrine of beneficial use for the benefit of society as a whole.

Additionally, it is my opinion that the majority of the court has restructured this proceeding and raised and asserted issues not raised, asserted or contemplated by the parties thereto and has departed completely from the basis upon which the trial court made its holding. This approach mystifies me, leaving me with the apparent inference that this is a device to avoid the clear holding of *Wyoming Hereford Ranch v. Hammond Packing Co.*, 33 Wyo. 14, 236 P. 764, and *Wyoming Hereford Ranch v. Hammond Packing Co.*, 31 Wyo. 31, 222 P. 1027.

The record is clear that no party to this proceeding has in any manner challenged the city's appropriation, priority, or use of the water thereunder, and strangely enough an examination of the amicus curiae brief of the city reveals that it does not even attempt to suggest that this is the case. Nor does the majority contend that the city will be in any manner bound by any declaration in this case because it is basic that since the city is not a party thereto, its rights could not be affected. Simply and logically, this appears to be a complete answer to the question of whether the City of Cheyenne is an indispensable party, but such approach is often unacceptable to the legal mind, although it is the writer's suggestion that these facts alone reveal the absence of a justiciable issue.

Although the majority opinion is sensitive to the limitations of an amicus curiae brief, a careful reading of the opinion suggests that it has been unable to apply these limitations, which is improper. An amicus curiae brief cannot "create, extend or enlarge the issues," *City of Tempe v. Prudential Insurance Company of America*, 109 Ariz. 429, 510 P.2d 745, 748, dismissed 414 U.S. 1088, 94 S.Ct. 717, 38 L.Ed.2d 546; *Hootch v. Alaska State-Operated School System*, Alaska, 536 P.2d 793, 809; *Morgan County Commission v. Powell*, 292 Ala. 300, 293 So.2d 830, 840.

So far as I am able to analyze and understand, the holding of the majority that the City of Cheyenne is an indispensable party in this case is based upon three propositions, most summarily stated as follows:

1. That because of conditions which *might* be imposed it could become uneconomical for Husky to purchase its water from the city, and that a renegotiation or an abandonment of the contract might follow, which "could have serious effects upon the ability of the city to meet bond obligations * * * should the refinery operations be discontinued or Husky's purchase of the water terminated."

2. That in the absence of the city, any decision made herein against Husky would affect the city "as a matter of stare decisis."

3. With some apparent relationship to the last-mentioned point, the majority opinion apparently asserts that Husky is

an agent of the city, which would make it an indispensable party.

An examination of these, in my opinion, reveals affirmatively the impropriety of the assertion that they indicate an indispensable status of the city.

The first is based upon speculation and the imagined possibilities existent in the mind of the opinion writer. Declaratory judgment actions grant no power to courts " 'to determine future rights or controversies in anticipation of events that have not occurred,' " *Cranston v. Thomson*, Wyo., 530 P.2d 726, 729, quoting *Glasgow v. Fox*, 214 Tenn. 656, 383 S.W.2d 9, 13.

Declaratory judgment actions do not require the joinder of persons who will be affected only by precedent, *Attorney General v. Kenco Optics, Inc.*, Mass., 340 N.E.2d 868, 870. The writer further suggests that by application of the rule in *Cranston* the same result is indicated. If the writer may be indulged in his own speculation—as has been quite freely done herein—may it be observed that if this basis has any validity there is a strong possibility that every municipality which has water rights and which sells water to industrial users is an indispensable party herein.

To sustain the agency relationship and that this decision will affect the city, the majority relies upon the case of *Metropolitan Denver Sewage Disposal District No. 1 v. Farmers Reservoir and Irrigation Company*, 179 Colo. 36, 499 P.2d 1190, 1192, to apparently satisfy itself that any decision rendered against Husky will affect the city in this case.

This writer is totally unable to apply that case to this proceeding because of the marked factual differences. That case is based upon the agreed facts and conditions of the contract between Denver and Metro. In effect Metro was only treating sewage, and once it had completed the treatment of the

sewage its function had ceased. The extent of Denver's control was such that it was the same as if Denver alone had treated it, and based thereon that case decides Metro is an agent of Denver. I am unable, by any construction of the facts herein, to attribute to Husky any agency arrangement, Husky being merely a purchaser of the water and using it for its own purposes with no provision that it be returned to the City of Cheyenne.

In my joinder in Justice Raper's dissent, I make full reliance upon his disposal of such matters and the authority cited therein, which I do not specifically mention in this opinion.

In my view it is, however, necessary not only to require Husky to apply for a permit but to reverse and set aside the judgment of the trial court insofar as it holds that the rights of the intervenors were not infringed upon and to set aside the dismissal with prejudice of the intervenor's petition.

The historical use of water has been long recognized, and to deprive the intervenors in this case of a proper forum in which to assert their claim would be devastating, not only to them, but to others whose rights may be dependent upon an application of such doctrine throughout the state. The writer may suggest, however, that this question may not be ripe unless and until the board of control and the State Engineer shall have granted a permit with conditions therein which would result in the violation of their rights, and that they certainly should be heard.